# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|                                                         |     |                      |
| ------------------------------------------------------- | --- | -------------------- |
|                                                         | )   |                      |
| In the Matter of the Last Will and Testament            | )   | C.A. No. 8948-MA     |
| Of Edward B. Sandstrom, Deceased                        | )   |                      |
|                                                         | )   |                      |

## MASTER'S REPORT

Date Submitted: August 27, 2015
Draft Report: October 30, 2015
Final Report: April 4, 2016

Petitioners are seeking to substitute the first page of the Last Will and Testament of Edward B. Sandstrom (hereinafter "Mr. Sandstrom," "the testator," or "the decedent"), which was admitted to probate by the Register of Wills for Sussex County on April 23, 2013 (hereinafter "the 2013 Will") with a writing they allege to be a copy of the first page of the will that was actually executed by the testator, but which was subsequently lost or destroyed. In the alternative, Petitioners request that the Court reform the 2013 Will because it does not accurately reflect the testator's intent. If reformation is not available, Petitioners request that the Court impose a constructive trust in their favor on real property located at 34772 Frontier Road, Lewes, Delaware 19958 (hereinafter "the Lewes house"), to avoid the testator's son being unjustly enriched because the Lewes house was devised to the testator's son in the 2013 Will, despite the testator's clear and undisputed intention to leave the real property to Petitioners.

Procedural Background:

On September 26, 2013, Petitioners Shaun and Jessalynn Potts filed a Verified Petition to Reform Will.[1] Attached to the Petition was the affidavit of Neil Dignon, Esquire, the scrivener of the 2013 Will, averring that he had corrected the first page of a will he drafted to reflect the testator's intent prior to the testator's execution of the will on March 25, 2013, but that testator's son subsequently probated a will containing the incorrect first page, rather than the corrected first page. A Verified Answer was filed by Respondent Edward G. Sandstrom (hereinafter "Eddy") on November 26, 2013,[2] in which Eddy alleged that he had never seen a "corrected first page," and that the alleged "incorrect first page" was the page provided to him with the rest of the will for admission to probate.[3] Eddy also denied that his father was capable of making any substantive changes to his will on March 25, 2013. According to Eddy, the 2013 Will speaks for itself and revisions to the 2013 Will are barred by the applicable statute of frauds.

Pretrial proceedings moved slowly in part due to Respondent's tardiness in responding to the Verified Petition and Petitioners' discovery requests, and the

---

[1] Docket Item ("DI") 1.
[2] DI 6.
[3] I use first names to avoid confusion or repetition, and intend no disrespect by this practice.

illness of Respondent's original counsel.[4] Following substitution of counsel on April 2, 2015 and further discovery,[5] Respondent filed a motion *in limine* on May 22nd, requesting that all oral statements offered to demonstrate the alleged testamentary intent of Mr. Sandstrom be excluded from the evidentiary record.[6] Petitioners' pretrial brief was filed on June 1, 2015, in which they argued for the first time that if the corrected first page had been lost or destroyed after execution of the will, the corrected first page should be given effect by the Court.[7] The day before the pretrial conference on June 11, 2015, Respondent moved to amend his Verified Answer to add several new affirmative defenses.[8] On June 11, 2015, Respondent filed a motion for partial summary judgment, arguing that no fraud had been alleged or found regarding the 2013 Will, and that the Court lacked the power to reform a will by inserting language allegedly omitted from the will as a result of scrivener's error.[9]

In order to make a complete record for *de novo* review, I reserved decision on Respondent's motion *in limine* until after trial. Thereafter, to preserve his objection to the introduction of extrinsic evidence of the testator's intent, Respondent continuously objected to oral statements of the testator's intent during

---

[4] DI 4, 6, 8-14, 16.
[5] DI 31.
[6] DI 45.
[7] DI 47.
[8] DI 55.

the one-day trial held on June 15, 2015. This is my draft report following the submission of the post-trial briefs.

Factual Background:

Mr. Sandstrom died after a short illness on April 3, 2013, at the age of 78 years.[10] At his death, Mr. Sandstrom owned a house near Lewes, but he had previously resided in the Dover area where he raised his family.[11] His daughter Julie had died at age 20 in 1978 after a car accident.[12] In 2013, Mr. Sandstrom's surviving family consisted of his son Eddy, two granddaughters, a brother, and two sisters.[13] At the time of his father's death, Eddy resided in Camden, Delaware, and had worked for thirty years in the automobile business. Eddy's last employment involved managing car loans and titling issues.[14]

In addition to his family, Mr. Sandstrom also had several close friends, including Bryan Henry Baker and his wife, Dorothy, who live in Wyoming, Delaware.[15] Baker and Mr. Sandstrom had served together in the United States Air Force. They met in the mid-1960s when Baker was posted to the Air Force base in

---

[9] DI 57.
[10] Joint Exhibit ("JX") 15.
[11] Trial Transcript ("TT") 237.
[12] TT 190-191.
[13] Mr. Sandstrom was divorced from his wife in the 1980s and never remarried. TT 239. His siblings reside in California, Wisconsin, and Minnesota. TT 154.
[14] TT 237.
[15] TT 149-150.

Dover.[16]   Over the ensuing years, the Bakers and Mr. Sandstrom socialized together many times, including taking trips to visit family in Minnesota and Hawaii, and several vacations in Mexico.[17]   Baker was Mr. Sandstrom's best friend.[18]   In the 2013 Will, Mr. Sandstrom bequeathed his vehicles to Baker and named Baker as executor of his estate.[19]   He also named Baker as his attorney-in-fact in a limited power of attorney document executed on March 25, 2013.[20]

A few months before the death of his daughter in 1978, Mr. Sandstrom met Peter Rigterink, who had moved to Delaware that year to work for the Playtex Company.[21]   Thereafter, Mr. Sandstrom spent Christmas, Thanksgiving, and other holidays with the Rigterink family, and also vacationed with them on the Outer Banks in North Carolina.[22]   For over twenty years, he and Rigterink attended Army-Navy football games together.   Mr. Sandstrom was especially close to Rigterink's daughter Jessalynn, whom he had known since her birth.[23]   During the seven years that Jessalynn attended college and graduate school, from 1998

---

[16] TT 175.
[17] TT 175.
[18] TT 151.
[19] JX 6.
[20] JX 8.
[21] TT 190-191
[22] TT 191.
[23] TT 192-193, 215.

through 2004, she resided with Mr. Sandstrom in his Lewes house each summer while she worked as a lifeguard at the beach.[24]

In 2006, Jessalynn married her college boyfriend, Shaun Potts, on a beach in North Carolina.[25] Mr. Sandstrom, together with Jessalynn's father and stepfather, walked the bride down the "aisle" during the wedding ceremony as her third father.[26] Whenever Shaun and Jessalynn visited Delaware they stayed with Mr. Sandstrom in his Lewes house.[27] Mr. Sandstrom hosted birthday parties for Shaun and Jessalynn in his Lewes house, and also a baby shower when they were expecting their first child.[28] He spent several Thanksgivings in California with the young couple after they moved there in 2010.[29]

Mr. Sandstrom was also an active member of his church where he became friends with Neil Dignon and Dorothy Blakely.[30] In 2004, at Mr. Sandstrom's request,[31] Dignon drafted a will (hereinafter "the 2004 Will),[32] and an advanced

---

[24] TT 193-194, 214.
[25] TT 203-04.
[26] TT 205.
[27] *Id.*
[28] *Id.*
[29] TT 206.
[30] TT 5-6, 64.
[31] Dignon has been a member of the Delaware Bar since 1997 and a solo practitioner since 2007. TT 62-63. He practices consumer bankruptcy, criminal law, and immigration law and prepares simple wills, mostly for people he knows. Over the years Dignon has been practicing law, he has drafted three to five dozen wills. TT 63.
[32] JX 1.

health care directive naming Baker as Mr. Sandstrom's health care representative.[33] In 2010, Blakely experienced complications following eye surgery, the treatment of which was going to require her to make frequent day trips to a Baltimore hospital.[34] Blakely asked Mr. Sandstrom's help with transportation because her husband could no longer safely drive a car.[35]

For approximately two years, Mr. Sandstrom drove Blakely to and from Baltimore, first on a monthly basis, then every three months, and then every six months.[36] Their final trip to Baltimore together occurred on February 21, 2013.[37] It was during this trip that Mr. Sandstrom became concerned about his health after noticing that his urine was dark.[38] He was admitted to Beebe Hospital in Lewes on March 5, 2013.[39] During the following weeks, Blakely was a frequent visitor to the hospital as she tried to lift Mr. Sandstrom's spirits with conversation and food.[40]

Baker and his wife were vacationing in Florida when they got a call from Rigterink that Mr. Sandstrom was in the hospital.[41] They drove home the

---

[33] JX 10.
[34] TT 6.
[35] *Id.*
[36] TT 7.
[37] *Id.*
[38] TT 8.
[39] TT 9-10.
[40] TT 11, 14.
[41] TT 153.

following day, making the hospital their first stop.[42]  Early on the morning of March 25th, Baker called Dignon and asked if he would be willing to come to the hospital because Mr. Sandstrom wanted to make some changes to his will.[43]

Dignon had another reason for visiting the hospital that morning.  His best friend had suffered a cardiac arrest while undergoing a routine test at the hospital.[44]  Although his friend had survived the heart attack, Dignon had already been called by the friend's wife, and he spent an hour or two in the morning in the intensive care unit of the hospital before visiting Mr. Sandstrom.[45]

Around 11 or 11:30 a.m., Dignon went up to Mr. Sandstrom's room.[46]  Blakely and another person unknown to the lawyer were present, but shortly after his arrival, they stepped into the hall.[47]  Mr. Sandstrom then told Dignon that he wanted to leave his cars to Baker, appoint Baker as his executor, and he wanted to leave the Lewes house to Jessalynn Potts, a woman who was very special to him.[48]  After Dignon advised that the proposed changes would result in disinheriting Eddy, Mr. Sandstrom informed Dignon that he wanted Eddy to have his accounts

---

[42] *Id.*
[43] TT 67-68, 155.
[44] TT 67.
[45] TT 67-68.  Later that afternoon, Dignon went downstairs and asked his friend's son to serve as the second witness to Mr. Sandstrom's will.  TT 21-22, 86.
[46] TT 68.
[47] TT 68, 69.
[48] TT 69-70.

at Morgan Stanley.[49]  Since Dignon did not know whether there were beneficiaries named on these accounts, he prepared a power of attorney document so Mr. Sandstrom could appoint Baker as his agent to make any beneficiary designation changes.[50]  Dignon made the requested testamentary changes to the electronic version of Mr. Sandstrom's 2004 Will that was saved on Dignon's laptop computer.[51]

When Dignon went to the nurse's station to find a printer, he was directed to the hospital's IT department.[52]  After unsuccessfully trying to email his Microsoft Word file to the hospital's printer, Dignon copied the file onto a thumb drive borrowed from someone in the IT department, who then printed out the draft will

---

[49] TT 72.

[50] TT 49, 84.  Baker did not change the beneficiary designations before Mr. Sandstrom passed away on April 3rd.  Mr. Sandstrom's granddaughters were the designated beneficiaries of his retirement accounts, JX 12, and they also inherited his investment account at Morgan Stanley as a result of being the beneficiaries of the decedent's residuary estate under the 2013 Will.  JX 6.  After Mr. Sandstrom's death, Eddy transferred all the funds and securities in the investment account to an estate account in his capacity as personal representative of the decedent's estate.  JX 12 & 13.  Eddy then spent approximately $75,000 of these funds on the mortgage and repairs to the roof and air-conditioning of the Lewes house, and on his own bills, before sending a check for the remaining funds, approximately $70,000, to one of his daughters to share with her sister.  TT 260-262, 266.

[51] TT 76.  Eddy was the beneficiary of the Lewes house in the 2004 Will.  JX 1.  After Dignon reviewed the electronic version of the 2004 Will on his computer, he discovered that Baker was already the beneficiary of Mr. Sandstrom's vehicles so he did not have to revise Article Second, Paragraphs C and D.  *Id.*

[52] TT 77.

on the hospital's printer.[53] Dignon reviewed the document, discovered an error on the first page, and made the correction to the electronic file.[54] The IT person then printed out the corrected first page.[55] After ensuring that his file had been erased from the IT department's thumb drive, Dignon returned to Mr. Sandstrom's room with the seven-page draft will and the first draft page containing the error (hereinafter "the incorrect first page").[56]

Dignon read the draft will with the corrected first page to Mr. Sandstrom, who approved the changes to his will.[57] Then Dignon left the room to find Blakely and a second person to witness Mr. Sandstrom's signature. After he returned with the two testamentary witnesses, Dignon observed Mr. Sandstrom execute a document containing the corrected first page and pages two through seven of the draft will that had been printed in the IT department of Beebe Hospital.[58] According to Dignon, he placed the executed will in a file bin on the wall of Mr. Sandstrom's hospital room.[59] Dignon then suggested that he take the testator's

---

[53] TT 77-78.
[54] TT 78-79.
[55] TT 80.
[56] TT 84-85.
[57] TT 85-86, 138-139.
[58] TT 101.
[59] On March 25th, a limited power of attorney document naming Baker as attorney-in-fact for Mr. Sandstrom also was printed and executed in Beebe Hospital. TT 84; JX 10. This document was also placed in the file bin on the wall of Mr. Sandstrom's hospital room with Mr. Sandstrom's will.

original 2004 Will back to his office and destroy it, and Mr. Sandstrom agreed.[60] Dignon recalled destroying the old will, but he could not recall placing the new will in an envelope or stapling its seven pages together.[61] Dignon also could not recall what he had done with the incorrect first page.[62]

The following day, Dignon returned to the hospital with his notary stamp to notarize the will.[63] He did not review the will during this brief visit with Mr. Sandstorm and, after stamping his notary stamp on the document, he again placed the will in the file bin.[64] On March 26th, according to Dignon, the will was not in an envelope and was not stapled.[65] He never saw the document again before Mr. Sandstrom's death.[66]

---

[60] TT 87.

[61] TT 87, 116. Blakely testified that Dignon held the will with his hand on the upper left corner of the document while she and the other witness signed it. TT 22-23. She described the pages as having been folded over, but she did not see Dignon staple the document nor did she see any fastening device holding the pages together. TT 24, 50. According to Blakely, Dignon put a stack of pages into a large brown envelope before placing the envelope in a file bin on the wall of Mr. Sandstrom's hospital room. TT 23, 46-47, 49-50.

[62] TT 88.

[63] Dignon did not have his notary stamp with him at Beebe Hospital on March 25th because he had left from home that morning, and the notary stamp was in his office. TT 88-89.

[64] TT 89.

[65] *Id.*

[66] *Id.*

Eddy testified that some time before his father was transferred to a rehabilitation facility on March 28th,[67] Mr. Sandstrom informed his son that he had made revisions to his will, and had made Baker his executor and health care agent.[68] He then asked his son to deliver the brown envelope to Baker.[69] Eddy testified that he retrieved the envelope from a "little plastic office holder" and took it out to his pickup truck.[70] His father's announcement had upset Eddy because Eddy had been talking with his father's doctors for the past few weeks.[71] Now that Mr. Sandstrom had made Baker in charge of his medical care, Eddy was concerned that he would no longer have any say over his father's care and treatment.[72] While sitting in his truck parked outside of the hospital, Eddy opened the envelope and glanced at the will.[73] He testified that he saw Jessalynn's name and his own name,

---

[67] According to the hospital records, Mr. Sandstrom was discharged from Beebe Hospital to Cadia Rehabilitation Renaissance in Millsboro, Delaware on March 28, 2013. JX 10 & 11.
[68] TT 243.
[69] Id.
[70] TT 244.
[71] TT 241. Although Eddy testified that he had spoken to the doctors every day, among the Beebe Hospital medical records was the 2004 Advanced Health Care Directive naming Baker as Mr. Sandstrom's health care representative. JX 10. It is unclear who was making health care decisions on Mr. Sandstrom's behalf during his first stay in the hospital. Since two witnesses described Mr. Sandstrom as "sharp as a tack" during this time, it is possible that Mr. Sandstrom was making his own decisions. TT 28, 179. What was new was not Mr. Sandstrom's appointment of Baker as his health care agent, as Eddy testified, but Baker's appointment as Mr. Sandstrom's attorney-in-fact.
[72] TT 244, 246, 257.
[73] TT 245.

put the will back in the envelope, and closed it without altering the will "in any way, shape, or form."[74] Eddy then drove to the Bakers' house in Camden. Because he did not think the Bakers were at home, Eddy did not bother to stop and get out of his vehicle.[75] Instead, Eddy rolled down the window of the truck, threw the envelope at the Bakers' front porch, and then drove off.[76]

Baker was at home and observed Eddy's arrival and departure. He retrieved the envelope from his driveway and read the will.[77] Baker knew that Mr. Sandstrom wanted to leave his Lewes home to Jessalynn,[78] so he was confused when he read the document. Baker's wife also thought the paragraph about the house did not make sense; she did not understand why it appeared to leave the house to Eddy.[79]

The document that was admitted to probate (the 2013 Will) contains the following provisions in Article Second beginning on page one and carrying over to page two:

A. Should I predecease my dear friend, Shaun Jessalynne Potts, by Thirty (30) days or more, I hereby devise and bequeath the real property located at 34772 Frontier Road, domiciled outside the City of Lewes, County of Sussex in the State of Delaware, to my beloved son Edward G. Sandstrom.

---

[74] TT 245-246, 257-58.
[75] TT 247.
[76] TT 156, 245-47.
[77] TT 156.
[78] TT 151-153
[79] TT 182-183.

B.  Should my dear friend, Shaun Jessalynne Potts predecease me or should I predecease my dear friend Shaun Jessalynne Potts, by fewer than thirty (30) days I hereby direct that the real property located at 34772 Frontier Road, outside the City of Lewes, County of Sussex in the State of Delaware, shall pass with the rest and residue of my estate.

C.  Should I predecease my good friend, Byron Henry Baker, of 8457 Westerville Road, Camden, DE 19934-9779, by Thirty (30) days or more, I hereby devise and bequeath whatever vehicles I may own at the time of my death, subject to any liens or encumbrances against said vehicles existing at the time of my death to my good friend, Byron Henry Baker.

D.  Should my good friend, Byron Henry Baker predecease me or should I predecease my good friend Byron Henry Baker, by fewer than thirty (30) days, I direct that whatever vehicles I own at the time of my death shall pass with the rest and residue of my estate.

E.  I hereby devise and bequeath the rest and residue of my estate, both real and personal, of every name, nature and kind whatsoever, and wheresoever, the same may be situated, to my beloved grandchildren, Jennifer Christine Wells, present, and Janet Claire Sandstrom, presentlya, [sic] in equal parts, share and share alike pursuant to the following caveats;[80]

Baker testified that he immediately called Dignon and asked him to correct the will, but the lawyer informed him that it was just legal jargon.[81]  At trial, Dignon denied that he had ever been asked by Baker to correct the will.  He did remember a telephone call from Baker who had explained that Shaun was, in fact, a separate person and Jessalynn's husband.[82]  Dignon testified that he never heard

---

[80] JX 6.
[81] TT 162, 164, 168, 182-184
[82] TT 91, 93.

Mr. Sandstrom refer to Jessalynn's husband by name so he had understood "Shaun Jessalynne Potts" and "Jessalynne Potts" to be one and the same person. Dignon had thought that "Shaun Jessalynne Potts" was a female who preferred to be known by her middle name.[83]

Mr. Sandstrom remained in the rehabilitation facility for a few days. During a visit there, Mrs. Baker asked Mr. Sandstrom what exactly he wanted his will to say.[84] Mr. Sandstrom simply replied that he wanted Jessalynn to have the Lewes house and Eddy to have all the money in his Morgan Stanley accounts.[85] He thought the money would be better for Eddy because he did not believe Eddy wanted the house.[86] Mr. Sandstrom's health soon deteriorated and he was readmitted to Beebe Hospital on April 1st.[87] He died on April 3rd and his funeral took place on April 10th and 11th.

Sometime prior to the funeral, Baker arranged for Dignon to meet Eddy and Eddy's daughters at the Lewes house.[88] During this meeting, Dignon explained that Eddy's two daughters were to receive the decedent's IRA accounts and life insurance, but that the decedent had wanted Eddy to have the Morgan Stanley

---

[83] TT 107.
[84] TT 178.
[85] *Id.*
[86] *Id.*
[87] JX 10.
[88] TT 92-93, 157-158, 247-248.

investment account.[89]  Eddy's daughters indicated that they were willing to give their father the investment account.[90]  However, when Dignon informed them that the decedent had left the Lewes house to Jessalynn, Eddy and one of his daughters insisted that the decedent must not have been competent at the time.[91]

During the reception following Mr. Sandstrom's funeral, Dignon met the Pottses.  According to Shaun, they discussed the decedent's intent to leave the house to the young couple. [92]  Although Shaun had received a copy of the will from Baker, the couple did not have a chance to review the document until they were on the plane returning to California.[93]  On April 12th, Shaun called Dignon while Dignon was driving home from work.[94]  Shaun was confused about the provision that appeared to leave the Lewes house to Eddy.  Without the documents in front of him, Dignon sounded unsure, but he reiterated what he had told Shaun at the funeral.[95]

Following this telephone conversation, Dignon reviewed his computer file and confirmed that the Lewes house had been left to Jessalynn.[96]  He subsequently telephoned Eddy and explained that an incorrect version of the first page had been

---

[89] TT 248.
[90] TT 262.
[91] TT 93-94.
[92] TT 207.
[93] *Id.*
[94] TT 208.
[95] TT 208.

attached to the will, and offered to provide Eddy a copy of the corrected first page to execute his father's wishes.[97] Eddy responded that he was not going to change anything, and that Jessalynn was not entitled to the Lewes house because "she's not blood." [98] Eddy asked Dignon if he was smoking crack, and then informed the lawyer that he had already sent the will to probate.[99]

After Mr. Sandstrom's funeral, Baker decided to resign as executor.[100] Baker met Eddy in the office of Eddy's lawyer, Charles E. Whitehurst, Esquire.[101] Whitehurst read the 2013 Will and informed Eddy and Baker that Eddy was the beneficiary of the Lewes house.[102]   As they were leaving the lawyer's office, Baker asked Eddy whether he was going to do anything for Jessalynn since his

---

[96] TT 97-98.
[97] TT 96-99, 252.
[98] TT 99.
[99] TT 252.  On direct examination, when asked how his conversation with Dignon ended, Eddy testified:  "Pretty much I – pretty much he said, 'Well, what have you done with the will?' And I said, 'I've sent it to probate.  Good-bye.'  I had already taken it to the State.  And I remember him going, 'No, you didn't.'  And I went, 'Oh, yes, I did.'"  TT 252-253.
[100] TT 159.
[101] TT 249-251.
[102] The exact chronology of this meeting was unclear at trial.  Also unclear was how Whitehurst obtained the 2013 Will.  When asked if Baker brought the original will with him to the meeting at Whitehurst's office, Eddy replied:  "As – yes, as near as I remember.  Where else would it have come from?"  TT 249.  Baker, on the other hand, denied delivering the will to Whitehurst's office.  According to Baker, Eddy had given Whitehurst the will.  TT 163,167,169.

father had wanted her to have the house. Eddy allegedly replied, "I'll take care of her."[103]

On April 23, 2013, the 2013 Will was admitted to probate and Eddy was appointed personal representative of the decedent's estate.[104] Shortly thereafter, Eddy moved into the Lewes house because his own home in Camden was in the process of foreclosure.[105]

Issues:

Petitioners contend that the corrected first page was unintentionally lost after the will was executed or else it was intentionally destroyed by Eddy while it was in his possession. According to Petitioners, it is possible that Eddy then attached the incorrect first page to the remaining pages of the will. Since the record shows that the decedent's intention to leave the Lewes house to Jessalynn never altered, Petitioners argue that they have overcome the rebuttable presumption that a missing will, last in the possession of the testator was discarded or destroyed with the intent to revoke it.[106] Therefore, Petitioners contend that the corrected first page of the will should be admitted to probate in lieu of the incorrect first page.

---

[103] TT 159-160, 251, 268-269.
[104] JX 18 & 19.
[105] TT 238, 274.
[106] *See In re Estate of Heigle*, 2007 WL 1532387 (Del. Ch. May 8, 2007) (quoting *In re Marilyn S. Wilson Estate*, 1999 WL 504783 (Del. Ch. July 13, 1999) (ORDER) (citing *Putney v. Putney*, 487 A.2d 1125, 1127 (Del. 1984)).

Alternatively, Petitioners argue that the Court should reform the 2013 Will because the first page contains a mistake that was due to a scrivener's error, i.e., the mistaken inclusion of Eddy's name in the first page, and the scrivener's failure to fasten the seven correct pages and to destroy the incorrect first page. Petitioners argue that reformation should be permitted in this case because the error appears on the face of the 2013 Will. According to Petitioners, it is clear that the testator intended to devise the Lewes house to the Pottses because Eddy's devise is nonsensically conditioned on the Pottses' survival. Petitioners urge this Court to adopt the standard found in the Restatement (Third) of Property (Wills & Don. Trans.) § 12.1 (2003), allowing the introduction of extrinsic evidence to ensure that testators' intentions are honored.

Finally, Petitioners argue that if the corrected first page is not given effect, then the Court should consider the 2013 Will to be ambiguous because the provisions regarding the disposition of the Lewes house deviate so greatly from the standard drafting practice for survivorship clauses. Having two different beneficiaries in the same survivorship clause is absurd, according to the Petitioners, and creates an ambiguity as to the true beneficiary. Therefore, Petitioners argue that the Court should construe the ambiguous terms based on extrinsic evidence, which would lead to the only reasonable construction of the 2013 Will, i.e., the Pottses are the intended beneficiaries of the Lewes house.

Respondent argues that the Petitioners have not proved by the preponderance of evidence that the first page was lost or unintentionally destroyed as required by Delaware law. Nor did Petitioners prove that Eddy destroyed the first page. Respondent argues that it is not likely he would have been so upset and thrown the envelope containing the will out of his truck onto the Bakers' driveway unless he had believed that the 2013 Will disinherited him. Mere speculation is all the Petitioners have on their side, and mere speculation is not enough according to Eddy.

Respondent also argues that under settled Delaware law, this Court lacks the power to reform a will.[107] The few Delaware cases that suggest otherwise, Respondent contends, were either wrongly decided or else the Court merely assumed, without deciding, that it had such power.[108]

Finally, Respondent argues that construction of the 2013 Will would be inappropriate because the terms of the 2013 Will are neither patently nor latently ambiguous. The will is clear on its face that the Lewes house was left to Eddy so there is no need to resort to extrinsic evidence to interpret it. None of the words are susceptible to two meanings, which would render the document latently ambiguous. Therefore, Respondent argues, he is entitled to judgment in his favor.

---

[107] *In re Last Will & Testament of Daland*, C.A. No. 2920-VCL (Del. Ch. May 5, 2010) (Transcript).

Analysis:

The 2013 Will bearing the signatures of the testator and two witnesses, both attesting to the testator's sound mind and lack of undue influence, was admitted to probate on April 23, 2013.[109] Each of the seven printed pages of this document is properly numbered in consecutive order. The signature of the testator appears on page four, the signatures of the two witnesses appear on pages five, six and seven. The first three pages are unmarked by any handwriting; not even the initials of the testator appear on these first three pages.

The record shows that on March 25, 2013, two first pages of the testator's draft will were printed in the IT department of Beebe Hospital under the direction of the scrivener. The first page one to be printed, along with the six following pages of the draft will, contained a paragraph that devised the Lewes house to Eddy on the condition that Mr. Sandstrom predeceased "Shaun Jessalynne Potts" by 30 days or more.[110] The second page one to be printed, which was printed alone without the six other pages of the draft will, did not contain any references to Eddy.[111] Instead, the record shows that it contained a paragraph that devised the

[108] *See In re Estate of Pepe*, C.A. No. 8177-ML (Del.Ch. Mar. 1, 2013) (Transcript); *Marshall v. Rench*, 1868 WL 1259 (Del.Ch. Sept. 1868).
[109] JX 18.
[110] *Id.*
[111] TT 85.

Lewes house to "Sean Jessalynn Potts" on the condition that Mr. Sandstrom predeceased "Sean Jessalynne Potts" by 30 days or more.[112]

To be consistent with the language used in the preceding sections of this draft report, I will refer to the first page one as the "incorrect first page" and the second page one as the "corrected first page." According to the undisputed evidence, the "incorrect first page": (1) was not read to the decedent by the scrivener; (2) was not acknowledged by the decedent to be his testamentary intent; and (3) was not part of the testamentary document that was executed by the decedent before two witnesses with all the solemnity required by 12 *Del. C.* § 202. Nevertheless, the will that was filed in the Register of Wills on April 23, 2015, consisted of the "incorrect first page" and pages two through seven of the testamentary document that was executed by the decedent before two witnesses on March 25th.

Without speculating as to how the substitution occurred, if the "incorrect first page" was substituted for the "corrected first page" without the formality of re-execution before two testamentary witnesses, then the 2013 Will should never have been admitted to probate.[113] Since there is no evidence that any re-execution occurred, probate of the 2013 Will should be revoked, and the decedent should be deemed to have died intestate because his original 2004 Will was intentionally

---

[112] JX 7.

destroyed at his direction. The decedent's entire estate should pass to Eddy unless Petitioners can demonstrate by the preponderance of the evidence that (1) a valid will was executed by the decedent, (2) the terms of the missing first page, and (3) the first page was lost or unintentionally destroyed and that the decedent's testamentary intent was not altered prior to his death.[114]

Both in his motion *in limine* and throughout the trial, Eddy repeatedly objected to any declarations of the decedent's testamentary intent as inadmissible extrinsic evidence that cannot be considered by the Court to construe or vary the terms of an unambiguous will. Since it is undisputed that the first page of the 2013 Will was not executed by the testator on March 25th, the first page of the will which was executed by the testator on March 25th must have been lost or destroyed. Since declarations of a deceased testator are admissible as proof of the contents of a lost or destroyed will, I am at liberty to consider and weigh the evidence of the decedent's testamentary intent in this context.[115]

---

[113] *See In re Ainscow's Will*, 27 A.2d 363, 363-364 (Del. Super. 1942).

[114] See *In re Estate of Heigle*, 2007 WL 1532387 (Del. Ch. May 8, 2007) (quoting *In re Marilyn S. Wilson Estate*, 1999 WL 504783 (Del. Ch. (ORDER) (citing *Putney v. Putney*, 487 A.2d 1125, 1127 (Del. 1984)); *In re Estate of Bartelt*, 2007 WL 1310182, at *1 (Del. Ch. Mar. 26, 2007).

[115] *See Ainscow's Will*, 27 A.2d at 365.

In this case, the parties do not dispute that a valid will was executed by the decedent.[116] Both the scrivener and Blakely testified at length about the events surrounding the execution of the will.

The terms of the missing first page were established by the testimony of the scrivener,[117] and the copy of the "corrected first page" printed by the scrivener on April 12, 2013, from the electronic file saved on the scrivener's computer.[118] The metadata on this file reveals that the file was first created on March 25, 2013, at 12:39 pm, last modified on March 25, 2013 at 1:02 pm, and last printed on April 12, 2013 at 5:29 pm.[119] Although Eddy objected to the testimony of the scrivener as a violation of the best evidence rule,[120] this rule does not apply when the original document is missing or lost.[121]

The "corrected first page" states in pertinent part:

A. Should I predecease my dear friend, Sean Jessalynne Potts, by Thirty (30) days or more, I hereby devise and bequeath the real property located at 34772 Frontier Road, domiciled outside of the City of Lewes, County

---

[116] Respondent waived his affirmative defenses of lack of testamentary capacity and undue influence by failing to address the Petitioner's arguments on these issues in Respondent's Post-Trial Answering Brief.
[117] TT 85
[118] JX 7.
[119] JX 7.
[120] TT 85. *See* Delaware Rule of Evidence ("D.R.E.") 1002.
[121] *See* D.R.E. 1004(1). Respondent also objected to the copy of the will with the "corrected first page" as a violation of the best evidence rule even though the document previously had been disclosed, along with the metadata sheet, during discovery, and had been admitted without objection as Joint Exhibit 7. TT 82-83.

of Sussex in the State of Delaware, to my beloved friend Sean Jessalynn Potts.

B. Should my dear friend, Jessalynne Potts predecease me or should I predecease my dear friend Jessalynne Potts, by fewer than thirty (30) days I hereby direct that the real property located at 34772 Frontier Road, outside the City of Lewes, County of Sussex in the State of Delaware, shall pass with the rest and residue of my estate.

At trial, Respondent attempted to impeach the scrivener's credibility by suggesting that it was driven by fear of Petitioners filing a claim against him.[122] Respondent also challenged the accuracy of the scrivener's memory by pointing out that the name "Shaun Jessalynne Potts" in the 2013 Will was spelled "Sean Jessalynne Potts" in the "corrected first page," and that the absence of the name "Sean" or "Shaun" in front of "Jessalynne Potts" in paragraph B eliminated a carriage return and added an extra line of text at the bottom of "corrected page one." [123] This would have duplicated the same line of text that was on the first line on page two of the 2013 Will. However, any doubt about the scrivener's credibility or the terms of the missing page was eliminated by the testimony of two disinterested witnesses: Blakely and Mrs. Baker.

It was during one of their early trips to Baltimore that Blakely first heard the decedent state that when he died, he wanted his house to go to Jessalynn, whom he

---

[122] TT 102-103.
[123] TT 107-112.

referred to as his "daughter."[124]  According to Blakely's testimony, the decedent made this statement several times to her because they frequently talked about end-of-life issues and about getting their affairs in order.  Mrs. Baker similarly testified that before Mr. Sandstrom was hospitalized, he had told her that he wanted Jessalynn to have the house, and that Eddy was not interested in the house.[125]  The last part of this statement was corroborated by Eddy.[126]

Eddy argues, nevertheless, that the Pottses have failed to prove that he, Eddy, destroyed the "corrected first page," or that it was unintentionally destroyed or lost.  He contends that the Pottses have also failed to prove that they searched for the missing document and, thus, have failed to make a *prima facie* case for a missing will.

Mrs. Baker's testimony undermines Eddy's first argument.  Like her husband, Mrs. Baker could not make sense out of the language in the will.[127]  So when she visited Mr. Sandstrom at the rehabilitation facility shortly before his

---

[124] TT 36-37.  At trial, Eddy objected to Blakely's testimony as hearsay.  It is admissible under D.R.E. 803(3) as a statement of the declarant's then existing state of mind or emotion.

[125] TT 177-178.

[126] Eddy testified that he always had been told that he was going to get the beach house when his father died, and he would tell his father that he really did not want to live at the beach, but his daughters and grandchildren would enjoy it.  TT 242. According to Eddy, as late as the fall of 2012, the decedent kept saying that his son was going to get the beach house.  TT 253.

[127] TT 181-183

death,[128] Mrs. Baker explicitly asked the decedent what he wanted his will to say.[129] He told her that he wanted Jessalynn to have the house and Eddy to have the Morgan Stanley accounts.[130] This evidence satisfies the remaining elements needed to probate a copy of a missing will. First, it demonstrates that the decedent's testamentary intent had not altered before his death. Second, it demonstrates that the decedent would not have intentionally discarded or destroyed the first page of his will with intent to revoke it. Therefore, the "corrected first page" must have been unintentionally lost or destroyed some time after the will was executed before Eddy delivered the brown envelope to the Bakers' house.

Although the decedent had wanted Jessalynn to have the Lewes house, he never intended to disinherit his son. The decedent intended Eddy to receive his financial accounts at Morgan Stanley, which were valued shortly before his death at approximately $238,500.[131] To that end, he appointed Baker as his agent to act in his stead to change the beneficiary designations on these accounts. Since Eddy

---

[128] According to the medical records, the decedent was transferred to Cadia on March 28th, and readmitted to Beebe Hospital on April 1st. JX 10 & 11. While in Cadia, the decedent celebrated Good Friday with Blakely, who had arranged for their chaplain to administer the sacraments to him. TT 30-33. During this visit, the decedent informed Blakely that he was at peace even though he knew he was dying. TT 31.

[129] TT 178.

[130] TT 178.

[131] JX 12.

lived near Baker in Camden,[132] it is not surprising that the decedent would have asked Eddy to deliver the executed documents to Baker, presumably so Baker could safeguard the will and make the requested beneficiary changes as soon as possible. [133] Looking at the record as a whole, and given decedent's unequivocal statements of testamentary intent after the will was executed, I find that Petitioners have demonstrated by the preponderance of evidence that the "corrected first page" was unintentionally lost or destroyed.

Regarding the requirement of proof of a search, this was not a typical missing will situation where a widow or adult child futilely searches through a decedent's home and safe deposit box for a missing will. Here, the decedent was gravely ill and hospitalized when he executed his will. The "corrected first page" was in the decedent's hospital room from March 25th until March 28th at the very latest, when the decedent was transferred to Cadia. While he was in the hospital, the decedent had many visitors, and was in and out of surgery.[134] The decedent's son then had possession of the will for a short time before he delivered it to the

---

[132] TT 245.

[133] The decedent was aware of the risk that if the beneficiary designations were not timely changed, Eddy might be disinherited. TT 73-74. According to the scrivener's testimony, when Baker called to inform him that Shaun was Jessalynn's husband, they discussed the need for Baker to make the necessary changes to the Morgan Stanley accounts as Mr. Sandstrom's attorney-in fact. TT 91.

Bakers' home, although there is no evidence that Eddy had possession of the "corrected first page." Eddy denied altering his father's will, and his behavior in the Bakers' driveway tends to corroborate his testimony.

It was not until after Shaun had returned to California and called Dignon on April 12th, did it occur to anyone that a substitution might have mistakenly occurred after the will was executed.[135] By then, the decedent had been buried, Eddy had collected the decedent's few possessions that were left at Cadia, and the trail, so to speak, had gone cold.[136] A few months later, Petitioners initiated this litigation with Dignon's cooperation and affidavit, and sought discovery from Eddy.[137] No "corrected first page" has ever been produced, other than the copy that Dignon printed out on April 12th. The Pottses obtained a copy of the "corrected first page" from Baker on April 30th, who in turn had received it from Dignon.[138] I find that the Pottses have demonstrated that they conducted a search for the missing page, and were unable to find it.

To sum up, the Pottses have shown by the preponderance of evidence that: (1) a valid will was executed by the decedent; (2) the terms of the missing page;

---

[134] According to Eddy and the medical records, the doctors performed several biopsies on the decedent as they were unsure of the cause of his illness. TT 242-243; JX 10.
[135] TT 131.
[136] JX 11.
[137] DI 8.
[138] JX21.

and (3) the missing page was unintentionally lost or destroyed and the decedent did not alter his testamentary intent prior to his death. Therefore, I recommend that a copy of the "corrected first page" be admitted to probate with pages two through seven of the 2013 Will. As a result of this recommendation, I do not need to address the Pottses' alternative claims for reformation of the 2013 Will and imposition of a constructive trust.

Nevertheless, one other issue remains to be addressed concerning the "corrected first page." The language in Paragraphs A and B of Article Second, when read together, creates an ambiguity. Paragraph A devises the Lewes house to "Sean Jessalynn Potts" on the condition that the testator predeceases "Sean Jessalynne Potts" by 30 or more days. Paragraph B passes the Lewes house to the testator's residuary estate if "Jessalynne Potts" predeceases the testator or if the testator predeceases "Jessalynne Potts" by fewer than 30 days. It is not clear from this language whether the testator intended to leave the Lewes house to Shaun Potts, Jessalynn Potts, or to Shaun and Jessalynn Potts.

The cardinal rule in all cases of will construction "is to determine and give effect to the intention of the testator as it appears from the language of the entire

will when read in the light of surrounding circumstances." [139]   Statements of the testator as to intent generally may not be considered.[140]

Without repeating at length the facts outlined above, the record shows that of these two individuals, it was Jessalynn who had grown up under the testator's eyes. It was Jessalynn who had spent seven summers as a young adult residing with the testator in his Lewes house.  It was Jessalynn who had been escorted down the aisle by the testator, and it was the Rigterink family who considered the testator as one of their "clan."  The testator's relationship with Shaun was not of the same duration and closeness.  Therefore, it does not appear that the testator intended Shaun Potts to be the sole beneficiary of the Lewes house.

If the testator intended Jessalynn Potts to be the sole beneficiary of the Lewes house, then Paragraphs A and B, when read together, are unambiguous. Provided Jessalynn survived the testator by 30 days, she inherited the house.  If she predeceased the testator, or failed to survive the testator by 30 days, then the house would pass to the testator's two granddaughters.  Since Shaun's relationship with the testator was not as close as Jessalynn's relationship to the testator, it does not appear odd that the testator would have preferred to gift over the Lewes house to his own kin rather than Shaun in the event of Jessalynn's untimely death.

---

[139] *In re Last Will and Testament of Theodore W. Dixon*, 280 A.2d 735, 737 (Del. Ch. 1971) (citing *Delaware Trust Co. v. McCune*, Del. Ch., 269 A.2d 256*, aff'd*, *Bank of Delaware v. Delaware Trust Co*., 280 A.2d 534 (Del.Super. 1971)).

If the testator intended to leave the house to both Shaun and Jessalynn Potts, then Paragraphs A and B, when read together, are ambiguous. If Jessalynn predeceased or failed to survive the testator by 30 days, it would be uncertain whether the Lewes house would pass to Shaun or the testator's granddaughters by operation of Paragraph B. On the other hand, if Shaun predeceased or failed to survive the testator by 30 days, it would be unclear whether Jessalynn would receive the gift or whether the gift was void since it was conditioned on Shaun's survival.

The testator did not have a large or complex estate. He owned a house, its contents, and some vehicles. During his lifetime, he maintained close friendships with several people, friendships that endured for decades. One of those friends was Baker. The testator left his cars to Baker. Another one of those friends was Jessalynn, whom the testator viewed as a daughter. Given his special relationship with Jessalynn, I find that Paragraph A in the "corrected first page" should be construed as a devise of the Lewes house to Jessalynn Potts.

Conclusion:

For the reasons stated above, I recommend that the Court revoke the probate of the 2013 Will, and admit to probate a copy of the "corrected first page" as the

---

[140] *See Bird v. Wilmington Soc. Of Fine Arts*, 43 A.2d 476, 486 (Del. 1945)

first page of the Last Will and Testament of Edward B. Sandstrom with pages two through seven of the 2013 Will.

Exceptions:

In his exceptions to my draft report, Eddy raises for the first time the argument that Dignon's affidavit and trial testimony should have been excluded from the record as a violation of the attorney-client privilege. In addition, Eddy argues that Petitioners failed to establish the necessary *prima facie* case to overcome the common law presumption of *animo revocandi* where: (1) the terms of the missing first page cannot be demonstrated because only Mr. Sandstrom and Dignon had knowledge of its terms, Mr. Sandstrom is now deceased and Dignon is precluded by the attorney-client privilege from disclosing those terms; and (2) there was no evidence of any search for the missing first page. Eddy also argues that Petitioners failed to adequately plead a missing will theory.

Eddy has waived his right to object to Dignon's testimony and affidavit by failing to assert the attorney-client privilege before or during trial.[141] Even if this objection were not waived, it is without merit because under Delaware Rule of Evidence 502(d)(2),[142] there is no attorney-client privilege where both parties are

---

[141] *See Dep't of Corr. v. Del. Corr. Officers' Ass'n*, 2002 WL 31926610, at *3 (Del. Ch. Dec. 23, 2002).

[142] D.R.E. 502(d) provides that "there is no privilege under this rule: … (2) [a]s to a communication relevant to an issue between parties who claim through the same

claiming through the same deceased client. Here, the Pottses and Eddy are both claiming to have inherited Mr. Sandstrom's Lewes house, the Pottses through the missing corrected first page and Eddy through the incorrect first page that Eddy filed with the Register of Wills along with the other pages of the Will for admission to probate. Delaware courts, along with most other state courts,[143] allow a decedent's attorney to testify to communications concerning the drafting of a will.[144] Therefore, this exception is dismissed.

In his second exception, Eddy raises several challenges to the conclusion in my draft report that the Pottses had overcome the presumption that Mr. Sandstrom had revoked his will by intentionally destroying the corrected first page. The first challenge is based on Eddy's contention that the attorney-client privilege bars the admission and the Court's consideration of Dignon's affidavit and his testimony concerning the terms of the missing corrected first page. However, since the

---

deceased client, regardless of whether the claims are by testate or intestate succession or by inter vivos transaction."

[143] E.S. Stephens, "Privilege as to communications to attorney in connection with drawing of will," 66 A.L.R.2d 1302, at § 1 (1959) (supplementing 64 A.L.R. 184 (1930)). *See also* 98 C.J.S. Witnesses § 364 ("an exception to the posthumous survival of the attorney-client privilege exists when a controversy arises concerning the validity of the will or between the claimants under the will … . By this rule, the attorney-client privilege is not a bar to the admission of testimony by the lawyer-draftsman as to what the client intended in a will.") (footnotes omitted).

[144] *See Mahoney v. Healy*, 91 A. 208, 208 (Del. Ch. 1914). *See generally, In re Wilson's Estate*, 1999 WL 504783 (Del. Ch. 1999); *In re Kuklinski's Will*, 1995 WL 106504 (Del. Ch. 1995 (Master's Report); *In re Sharpley's Will*, 120 A. 586 (Del. Super. 1923).

attorney-client privilege does not apply in this case, there is no basis for the Court to exclude either Dignon's affidavit or his trial testimony from the record. This evidence, along with the copy of the corrected first page printed by Dignon from the electronic file saved on his computer, sufficiently established the content of the missing corrected first page of the Will. In addition, as discussed in my draft report, two disinterested witnesses testified that Mr. Sandstrom had told them that he intended to leave his Lewes house to Jessalynn Potts. This exception, therefore, is dismissed.

Eddy also contends that the Pottses failed to demonstrate that the corrected first page had been lost or unintentionally destroyed. According to Eddy, there was no evidence of what happened to the corrected first page, only speculation that it might have been lost or unintentionally destroyed. Eddy claims that it is equally plausible that the corrected first page was intentionally destroyed and, according to Eddy, the missing will theory does not apply to the intentional destruction of wills. Eddy also argues that in order to make a *prima facie* case of a missing will, the Pottses were required to present affirmative evidence of having made a search for the missing corrected first page. In this case, there was no evidence of a search having been conducted of Beebe Hospital for the missing page. Finally, Eddy argues that the Pottses never properly pleaded a missing will theory; this theory only appeared for the first time in the Pottses' Pretrial Brief.

Where someone other than the testator intentionally destroys a will, there is precedent in Delaware for admitting a missing will to probate upon proof of its contents and full execution.[145] Since there was no definitive proof of what happened to the missing corrected first page, it is within the realm of possibility that the corrected first page was intentionally destroyed, but not by or at the direction of the testator. Before his final illness, the testator had told several friends, including the Bakers, Sheila Blakely, and Peter Rigterink, that he wanted to leave his Lewes house to Jessalynn Potts. While in Beebe Hospital during his final illness, the testator instructed his scrivener that he wanted to leave his Lewes house to Jesslynn Potts, although the scrivener misapprehended the correct name of the beneficiary. Several days after executing his will and entrusting the will to his son Eddy for delivery to Baker, the testator again told Mrs. Baker that he wanted to leave his Lewes house to Jessalynn Potts.

The execution of the will took place in a hospital room under hurried and stressful conditions for both the scrivener and testator. The pages of the will were not fastened together, and were placed in a file bin on the wall of the hospital room which was neither secure nor private. The scrivener took the testator's original prior will back to his office to be destroyed, and a day or two later, Eddy removed

---

[145] *See Kearns v. Kearns*, 1843 WL 429, at *1 (Del. Super. Fall Session 1843) ("As the will cannot be revoked without the act and intention of the testator, if it be

the will at the testator's direction to deliver to Baker.  Instead of delivering the

document to Baker in person, Eddy threw a manila envelope containing the will

onto Baker's driveway.  Shortly thereafter, the testator was transported from the

hospital to a rehabilitation facility and his possessions were packed up and moved

to the facility by two friends.  A few days later, after the testator's death, Eddy

retrieved his father's possessions from the rehabilitation facility.  The Pottses'

subsequent requests for production of documents from Eddy failed to turn up the

missing corrected first page.

Eddy cites dicta in *Dawson v. Smith* and *In re Ainscow's Will* for the

proposition that a Court cannot merely presume a will is lost, there must be proof

of a search having been made to find the original page or document.[146]  Eddy

claims that the Pottses' failure to conduct a search of the hospital dooms their

efforts to prove a missing will.   A review of the jury charge in *Dawson*, however,

reveals an aspect of the missing will doctrine which I did not consider in my draft

report.  According to the jury charge in that case:

> If it had been shown to [the jury's] satisfaction by the evidence in the case, that after [the will] was made, she took possession of it, and that it continued in her possession until it disappeared, the presumption would be that she voluntarily destroyed it *animo revocandi*, that is to say with the intention of revoking or annulling it.  And yet, this presumption may be rebutted by

destroyed without that act or consent, it still exists as his will.  The will rests not in the paper but in the intent.")

[146] *See Dawson v. Smith*, 1866 WL 950 (Del. Super. Fall Session 1866); *In re Ainscow's Will,* 27 A.2d 363 (Del Super. 1942).

contrary evidence, or facts and circumstances to the contrary of it. For if on the other hand, you are satisfied from the evidence before you, that it had in the mean while been out of her possession and in the possession of another person, who had been entrusted with the keeping and preservation of it, the defendants must show to your satisfaction, that it came again into her own possession, or was actually destroyed by her direction, or it will not be held, or presumed to be revoked by her, but will be deemed to remain unrevoked by her. Or, in other words, if, in this case, it has been proved to the satisfaction of the jury that the will in question was out of her possession, and has not been shown to have returned again into her possession, then it is necessary for the defendants, who are opposing the establishment of it as her last will and testament, to show conclusively that it was destroyed by her direction. If, however, the jury shall be satisfied from the evidence that it was not destroyed by her, or by her direction, but that same was actually lost, or was destroyed by some other person without her direction, then the contents of it may be proved by competent and sufficient evidence *aliunde* and may be set up and established as substantially her same will and testament, whether it was so lost, or destroyed without her direction, either before, or after her death, provided the same was done without her knowledge in her life time, if it was done before her death.[147]

In this case, a day or two days elapsed between the execution of the will with the corrected first page and the delivery of the will with the incorrect first page to the Bakers' house. During this time, the will was out of the testator's possession, having been entrusted to Eddy for delivery to Hank Baker. As a result, according to *Dawson*, the burden now shifts to Eddy to demonstrate that the missing corrected first page was destroyed by the testator or at his direction because, under these factual circumstances, the will should not be presumed to have been revoked by the testator.

---

[147] *Dawson*, 1866 WL 950, at *5.

Eddy presented no evidence that the will with the corrected first page was ever returned to the testator and destroyed by the testator or that the corrected first page was destroyed at the testator's direction. In the absence of such evidence, the failure of the Pottses to have demonstrated that they had searched Beebe Hospital for the missing corrected first page is of no consequence because under *Dawson*, there is no presumption of revocation for the Pottses to overcome. Under these factual circumstances, the will would be deemed to have remained unrevoked by the testator, subject to being admitted to probate upon sufficient evidence of the contents of the missing corrected first page. This exception, therefore, is dismissed.

Finally, Eddy argues that the Pottses failed to adequately plead a missing will theory, and only raised it for the first time in their Pretrial Brief on June 1, 2015.[148] The record shows that in their original pleading filed on September 26, 2013, the Pottses sought reformation of the will as their only ground for relief because the will was alleged to be inconsistent with testator's intent. However, included among the petition's allegations were the following paragraphs:

20. It is unclear what happened to the Correct First Page and why the Filed Will contains the Incorrect First Page. Petitioners are unaware of who had possession of the Revised Will from March 25, 2013 until April 3, 2013.
21. The Filed Will is inconsistent with Testator's explicit intent to devise Testator's real property to Petitioners. Aff. ¶ 18. This inconsistency is the direct and proximate result of scrivener's error. That is, the Incorrect First

---

[148] Petitioners' Pretrial Brief, Docket Item ("DI") 47.

> Page was included either because Attorney had Testator mistakenly execute an incorrect version of the Will or because Attorney failed to fasten the correct pages together and the Correct First Page was mistakenly replaced with the Incorrect First Page before filing.[149]

Although not explicitly raised by the Pottses, the above factual allegations are consistent with a lost or missing will claim. Because of the extended illness of Eddy's first attorney and the subsequent substitution of new counsel, the litigation progressed very slowly and the deadline for fact discovery was extended until May 15, 2015 with a trial scheduled to take place on June 15, 2015.[150] In opposition to Eddy's May 22nd motion *in limine* seeking to exclude any extrinsic evidence of Mr. Sandstrom's testamentary intent,[151] the Pottses argued that such extrinsic evidence was relevant to their claims, asserting for the first time as an additional ground for relief the theory of a lost or destroyed will or pages of a will.[152] This theory was further developed in their Pretrial Brief.

The record shows that Eddy was on notice by May 29th that the Pottses were asserting the theory of a lost or missing will as a ground for relief. In Section V of their Pretrial Stipulation and Order filed on June 8, 2015, both parties reserved their right to seek amendments to the pleadings to conform to the evidence in accordance with Court of Chancery Rule 15(b). The Pottses did not seek to amend

---

[149] Petitioners Shaun D. Potts and Jessalynn R. Potts Verified Petition to Reform Will, DI 1.

[150] Stipulated Amended Scheduling Order. DI 41.

[151] Respondent's Motion *in Limine*, DI 45.

their pleading by asserting a claim for relief under a lost or missing will theory, but in post-trial briefing, both sides argued whether the evidence showed that the first page of the will had been lost or unintentionally destroyed.[153]  Rule 15(b) provides: "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."  It is too late for Eddy to complain about any inadequacy of the pleadings since he impliedly consented to the trial of these issues.  Therefore, this exception is dismissed.

For the foregoing reasons, the exceptions to the draft report are dismissed.  I am adopting my draft report as my final report as modified herein.  I refer the parties to Court of Chancery Rule 144 for the process of taking exception to a Master's Final Report.

Respectfully,

/s/ Kim E. Ayvazian

Kim E. Ayvazian
Master in Chancery

KEA/kekz

---

[152] Petitioners' Opposition to Respondent's Motion *in Limine*, at ¶ 8.  DI 46.
[153]  Petitioners' Post-Trial Opening Brief, DI 64; Respondent's Post-Trial Answering Brief, DI 65.