Helen S. PUTNEY,
Petitioner-Below, Appellant,

v.

Thomas W. PUTNEY and Hilton
Putney, Caveators-Below,
Appellees.

Supreme Court of Delaware.

Submitted: June 4, 1984.

Decided: Oct. 26, 1984.

Carl Schnee (argued) and Elizabeth M. McGeever of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for appellant.

Ben T. Castle (argued) of Young, Conaway, Stargatt & Taylor, and Thomas F. Luce, Wilmington, for appellees.

Before HERRMANN, C.J., McNEILLY, HORSEY, CHRISTIE, JJ., and STIFTEL, Judge.

McNEILLY, Justice:

This appeal is from a decision and order of the Court of Chancery refusing probate of a conformed photocopy of a will executed by Ellison W. Putney on January 13, 1978 (the "1978 Will"). In refusing probate the Court of Chancery found that the petitioner for probate, Helen Putney, had failed to sustain her burden of overcoming the presumption that testator destroyed the 1978 Will *animo revocandi*. We agree and affirm the decision of the Vice-Chancellor.

Ellison Putney was a very successful Wilmington businessman. From 1954 until his retirement in 1975, he ran a local blueprinting operation known as Wilmington Blue. He owned approximately 42% of the outstanding stock; his 94 year old mother Winifred Ward owned 48% of the stock; his son Thomas Putney owned 6% of the stock; and two individuals Robert Mason and Wilson Green owned 2% each. In addition to Wilmington Blue, Mr. Putney also managed Audio Visual Arts Inc. (AVA), a commercial art and photographic supplies business. He owned 41% of the outstanding stock of AVA at the time of his retirement in 1975, having previously transferred approximately 20% of his majority interest to Helen Putney, his daughter-in-law, and Ryan Putney, her son, his grandson, (23,-565 and 10,365 shares respectively). The balance, or approximately 39% of AVA stock was owned by Ellison Putney's mother Winifred Ward.

Ellison Putney had three sons, Thomas, Hilton and Hugh. Hugh died in 1981. Hilton was married in 1960 to Helen Putney, divorced in 1968, and presently is confined to Delaware State Hospital, although apparently mentally competent to manage his financial affairs. Thomas was married, divorced and subsequently married to Mary Putney, a trained nurse, admired by Ellison

Putney and in whom Ellison Putney confided his physical and health problems.

Under the 1978 Will Ellison bequeathed $5,000 to each of his three sons, his four grandchildren, and Thomas's former wife. The residue he divided between his mother and Helen Putney, the petitioner and proponent of the 1978 Will. Specifically to Helen Putney, the 1978 Will bequeathed all of Ellison Putney's stock interest in AVA and Wilmington Blue, and the adjoining real estate at 817 Tatnall Street.

Ellison Putney was very loyal and close to his Mother Winifred Ward. Mrs. Ward lived with him six months a year during the last four years of his life. When she was at her home in Utah Ellison called her every day. It was Mrs. Ward and her second husband who were the co-founders and successful builders of Wilmington Blue as a going business. It also was Mrs. Ward who gave Ellison 42% of her stock in Wilmington Blue, and helped him in the purchase of 817 Tatnall Street and the beginning of AVA. According to Mary Putney, Ellison Putney always said it was his Mother, Winifred Ward, who had given him everything he ever really had in life.

Mrs. Ward was particularly interested in Wilmington Blue expressing the hope to Ellison that it would always remain in the family and that her grandson Thomas would succeed to that business. Because of a legal battle involving the Will of Ellison's wife, Thomas's mother, Thomas and Ellison were estranged.

Subsequent to 1977, however, it appears that Thomas and Ellison resolved those differences since Thomas Putney was taken into the Wilmington Blue operation at Mrs. Ward's insistence and the two developed a closer working and social relationship. Ellison Putney continued to submit to his mother's wishes and kept his close personal relationship with Helen Putney from his mother until his death.

Ellison Putney, naturally, knew Helen Putney prior to her marriage to Hilton Putney in 1960. That father-daughter-in-law relationship blossomed into a constant companionship and love affair after Hilton and Helen Putney's divorce in 1968 and Hilton's psychiatric commitment to Delaware State Hospital.

Helen Putney had begun work at Wilmington Blue in 1965 as a bookkeeper, but left when Ryan was born in 1966. Shortly thereafter she started work at AVA. She was a hard worker and good business woman, and steadily advanced, with Ellison Putney's help, until she was made president of AVA in 1978. Throughout this period the close personal bonds between Ellison Putney and Helen Putney developed to the point that Ellison Putney built a home on land Helen Putney had acquired at a seashore resort. Together with Ryan they spent every weekend there. The three of them also spent every New Years' eve in Puerto Rico and ostensibly appeared to the public as man and wife. Ellison Putney went to great lengths to keep this relationship, which continued until Ellison's death, from his Mother.

Helen Putney argues that Ellison Putney's pattern of conduct over a period of thirty years prior to his death, evidenced a presumption that he did not intend to die intestate. Beginning in 1950 Ellison Putney had at least five different Wills. In each case Ellison Putney had a new Will drawn and executed before destroying the old one. That does not appear to be the case here, however, since there is no evidence in the record that Ellison Putney consulted an attorney about a new Will after he left his attorney's office with the 1978 Will in hand. Additionally, Ellison Putney's deathbed actions sufficiently buttressed the Vice-Chancellor's conviction that Ellison Putney had destroyed the 1978 Will *animo revocandi* knowing that he had "taken care" of Helen Putney and that he also had proven his loyalty to his mother Winifred Ward.

In 1982 it was suddenly discovered that Ellison had a brain tumor and there was no hope. Ellison was aware of his hopeless condition and so informed Thomas Putney's

wife Mary. Approximately seven weeks prior to his death Ellison Putney called a meeting in his hospital room of himself, his mother, and the other minority stockholders of Wilmington Blue. At that meeting Thomas was elected co-chairman of the Board of Wilmington Blue.

Prior to his operation from which he never recovered, Ellison Putney executed a power of attorney to Helen Putney, drawn by an attorney employed by Helen Putney. On the same day Helen Putney entered Ellison Putney's safe deposit box and removed all his things, including $20–30,000 worth of gold coins which Ellison Putney told her to keep. She cashed four treasury bills valued at $10,000 each and put them in a joint checking account with Ellison Putney, $20,000 of which Ellison Putney directed Helen Putney give to Thomas and Mary Putney for the purpose of acquiring additional space for Wilmington Blue expansion. In addition, between April and May, Ellison gave Helen property valued at between 70 and 80,000 dollars and transferred stock to Ryan worth approximately $6200.

Following Ellison Putney's death the 1978 Will, which was the last known Will, could not be found. The parties agree that since the Will was last seen in the possession of Ellison Putney, the presumption is that he destroyed it *animo revocandi.* Helen Putney contends she has borne her burden of proving that it is more probable that Ellison Putney did not revoke his Will *animo revocandi* than the presumed fact that he did revoke it. *Delaware Uniform Rules of Evidence* Section 301.

It cannot be disputed that Ellison Putney's loyalty and love were divided between his mother Winifred Ward and his paramour and former daughter-in-law, Helen Putney. It is the loyalty and love for her that Helen Putney contends is sufficiently persuasive to overcome the presumption that Ellison Putney did not intentionally revoke his Will. She relies upon the testimony of several witnesses who testified on her behalf that Ellison Putney and

Helen Putney were most compatible business-wise and otherwise; that Ellison had said he would "take care of Helen"; that he wanted Helen to control AVA; that he told Helen he would leave her his AVA stock and 817 Tatnall Street; and that there was an apparent husband-wife, father-daughter, or family relationship between Ellison Putney and Helen Putney.

The parties do not dispute that the standard to be applied to the evidence necessary to carry the burden of overcoming the presumption of revocation *animo revocandi* is to be found in the *Delaware Uniform Rules of Evidence* effective July 1, 1980. The pertinent Section 301 provides:

(a) Effect. In all civil actions and proceedings not otherwise provided for by statute or by these rules, a presumption imposes on the party against whom it is directed the burden of proving the nonexistence of the presumed fact is more probable than its existence.

Use of the words "more probable" mirrors this Court's accepted definition of "preponderance of the evidence". Applying that standard to this record we must agree with the Vice-Chancellor that Helen Putney's evidence does not overcome by a preponderance of the evidence the presumption that Ellison Putney revoked the 1978 Will *animo revocandi.*

For the foregoing reasons, the judgment of the Court of Chancery be, and it hereby is

\*     \*     \*

AFFIRMED.

STIFTEL, Presiding Judge, dissenting.

I disagree with the majority. The question is a simple one. Did Ellison Putney destroy his will so that he could die intestate? The law presumes that he did because his executed 1978 will cannot be found. Let us see if this is logical.

Ellison Putney was an astute business man. The Chancellor conceded this. This Court's majority agrees. Since 1951, he had been testate. He had five wills in all.

Every time his family situation changed, he changed his will. In 1961, when Ellison separated from his wife, he made a will in which he disinherited her. In 1962, he added a codicil. In 1963, he executed a new will in which his parents, Mr. and Mrs. Ward, were the beneficiaries and his three sons were contingent beneficiaries. In 1966, shortly after Thomas had been fired by his father from Wilmington Blue, and the will contest between Ellison and Thomas Putney was decided by the Chancellor, Ellison executed a new will which was similar to the 1963 will but contained no provisions for Thomas Putney. The 1966 will remained until Ellison Putney executed his 1978 will, which is the will the existence of which is questioned.

Until Thomas Wingate, Esquire, died, Ellison Putney saw his lawyer frequently about business matters; and Mr. Wingate's associate, Raymond Becker, Esquire, saw him in the office frequently waiting, without appointment, for Thomas Wingate. After Mr. Wingate's death, Ellison had Raymond Becker, Esq., prepare the 1978 will. When Ellison came to Mr. Becker's office to execute the 1978 will, he brought his old executed will with him and asked Raymond Becker to destroy it, which he did. This had been Ellison's past practice—to bring in the old will when he made a new one. Mrs. Winifred Ward, his mother, thought that Ellison would have had a will—she said so in her testimony. Ellison never talked to Raymond Becker, Esq., about the will—or any legal problem—after that. Ellison saw Mr. Becker frequently several times a month. They normally ate at the same restaurant. They met socially on occasion. But Ellison never mentioned to Mr. Becker that he wanted to change his will. The opportunity to do so was always there for months and years.

Ellison had three sons: Hugh and Hilton, twins; and Thomas. Hugh died. Hilton and Thomas survive. Hilton has had a history of mental illness. He had been in and out of mental institutions. He receives a 100% disability from the Army. He was found not guilty by reason of mental illness in a non-jury case in the Superior Court of this State, after he tried to commit suicide by causing an automobile accident which resulted in the death of one George Laird. Suit is pending in Superior Court by Mr. Laird's estate against the doctor at the Delaware State Hospital who, it is claimed, prematurely released him.

Since his commitment to the mental hospital, Hilton has tried to be released—without success. The majority opinion says that he manages his own business affairs. Up to now, his business management has not been good. An intestacy means that Hilton would get one-half of Ellison's estate. It is difficult to think that a bright Ellison would want this result. Would not Ellison have sooner changed his will leaving one-half the estate to Ryan—Hilton and Helen's son—whom Ellison admired and appreciated—rather than Ryan's father whose business ability is questionable?

A News-Journal story about Ellison and his relationship with Helen, Hilton's ex-wife, plus a recitation of the Putney family history, disturbed Ellison immensely. The distasteful story was cut from the News Journal paper that Ellison's mother received by delivery so that she would miss the story. The story about Ellison and Helen, his ex-daughter-in-law, was given to the press by Hilton through an attendant at the Delaware State Hospital. This story did not endear Hilton to Ellison, who was melancholy for a long time afterward. This incident would not have caused Ellison to tear up his will and favor Hilton with one-half of his estate.

Thomas worked for his father at Wilmington Blue from 1960 to 1965. His father then asked him to leave the business. He did. In 1961, Thomas started a landscaping business on the side. Pat Noonan came to manage the landscaping business and talked Thomas into starting an excavating business instead. Tom worked with the developers. The business lasted three years and failed in 1976. From 1975 until 1977, the only source of income to Thomas

was from the Navy—approximately $1,000 a year. He did have an interest in a photo library business which he started in 1971 as a hobby. It produced a very small income even though the gross was approximately $20,000 a year.

Until 1977, when Ellison rehired Thomas at Wilmington Blue as a favor to Thomas' grandmother, Mrs. Ward, Thomas and Ellison had been very unfriendly. Ellison was especially angry with Thomas because of a will contest in 1964 with his father over Thomas' mother's estate. Thomas' mother died in an automobile accident and left a holographic will. The Chancellor decided the case in favor of Ellison against Thomas.[1]

Helen Putney did not divorce Hilton Putney for no reason. After the first year of their marriage, their only child, Ryan, was born. Hilton had been in a mental institution on several occasions and discharged. He had a mental breakdown just before their divorce. Helen had no association with Hilton's father, Ellison, before the divorce.

Helen was married to Hilton for seven years. It was a difficult period. When she returned to Wilmington with her young child, she had nothing. She hardly knew Ellison. She worked at different jobs, including the News-Journal, and finally landed at AVA as a clerk. There, she worked hard. She was promoted because she produced. When the Manager became ill, she took his place. Ellison semi-retired in 1975. She devoted most of her time to the business and her son Ryan. Ellison respected her—she is an intelligent, energetic person and Ellison appreciated her business judgment. All the employees from Blue and AVA testified to this. She and Ellison drew closer. Ellison became devoted to her, as he had to his mother, and his Aunt Bessie. His mother and aunt had given him everything a couple of decades before. He was loyal—never forgot. Helen returned Ellison's affection. A close social and business relationship developed that lasted until his death.

Helen had purchased some land at the shore with her money and Ellison built a house thereon. They both went to the shore-house almost every week-end with Ryan and sometimes Helen's mother. Ellison used it for years. Ellison had been lonely. Helen and Ryan gave him a new life. He returned his appreciation by placing the shore-house in her name. There were other realty transactions in her favor where he had helped. This was a family— Ryan, Helen and Ellison. He treated Helen as his wife. They were married in fact but not in law. In his 1978 will, he treated her as he would probably have treated his wife. Ellison was completely devoted to her and to Ryan, his grandson. Ryan's high school basketball coach said Ellison came to every basketball game to watch Ryan play. Ellison gave a party for the basketball team. Ellison often had talks with Ryan about his future with AVA. This close relationship with Helen and Ryan lasted until Ellison's death. It was unnatural for Ellison to ignore Helen and Ryan by dying intestate. They and the businesses had been most of his existence during his last years.

True, Tom and Mary, Tom's wife, testified that Ellison's relationship became much closer to Tom and Mary and their children in the years immediately preceding his death; but that relationship, according to all the independent witnesses, was nominal in comparison with Ellison's closeness to Helen and his grandson, Ryan.

---

1. It is interesting to note that in that will, Thomas' mother stated in Item 3:

"I do not divide the above equally one-half to my son Thomas W. Putney and one-half to my son Hilton W. Putney, not because I love Hilton less than Thomas (through lack of affection or concern for Hilton) but due to the fact that I think Thomas W. Putney will receive no more than $1.00 from his father, Ellison W. Putney's estate, and that Hilton may receive all of his father's remaining assets. If I am wrong, I can only hope and pray that my sons will do the right things with each other."

There is an underlying thought that Helen did too well in her association with Ellison. She got a shore-house, paid for by Ellison; she purchased on favorable terms three Tatnall Street properties on which AVA was located. She was able to buy 901–903 Orange Street because Ellison had guaranteed the bank loan made for this purpose. She received stock in AVA—23,565 shares. She received other personal property through the close association, such as the proceeds from the sale of $40,000 maturity value Treasury Bonds that she cashed for $29,000 when Ellison was in the hospital. It should be noted that AVA's business increased in the period of time Helen was running it. AVA received National mention; major new customers were obtained; and local exhibits entertained large crowds and received commendations.

Helen gave up a major portion of her young adult life to AVA and to taking care of a person a quarter of a century older than she, but someone whom she respected and admired. She learned a lot and gained a lot from him; but he also managed to gain from his association with her. His life would not have been as lively and interesting without her. Ellison was not in good health. She helped him survive. What she got as a consequence of the association, Helen probably deserved because of what she did for Ellison and his grandson and the businesses he loved.

Throughout the record, Helen's interest was AVA. Tom never mentioned AVA—just Wilmington Blue. Both were thriving businesses. Helen already owned three of the four buildings in which AVA operated —811, 813 and 815 Tatnall Street. The will was to leave her 817 Tatnall. She then would own all the properties in which AVA is located. Without the will, 817 will go to Tom and Hilton and Helen will have the other three properties. Somewhat illogical!

Ellison, in his last days at the hospital, decided that he would try to balance the equities between Tom and Helen. There is an indication he wanted Tom to control Wilmington Blue, where he had been doing some good work. From his hospital bed, he managed, with Helen's cooperation, to deliver $20,000 to Tom so that he could buy the Stenta properties at 841 and 845 Tatnall Street. Thus, Tom would own 841 and 845 Tatnall Street.[2] This would allow room for expansion of Wilmington Blue on Tatnall Street. Blue also owned the property at 3rd and Greenhill. Ellison signed his personal check for $10,000 in favor of Tom and Helen drew a check from the joint account for $10,000 in favor of Tom. Both checks were sent to Tom by Helen.

Ellison, at the urging of Winifred Ward, his mother, caused a special meeting to be called at the hospital to make sure that her favorite grandchild was taken care of by placing Tom in control of Wilmington Blue. At the meeting, Tom was elected President of Wilmington Blue, with all of Ellison's stock, and Mrs. Ward voting her stock for his presidency. There was no action at this special meeting that was called in Ellison's hospital room to change the status of AVA, which the non-existence of a will would do. Helen remained as President. With the will, Helen would control AVA and the four properties on which it was located and with the help of Mrs. Ward's will, Tom would control the three properties up the block from AVA and the Third and Greenhill Avenue property.

As of June 6, 1982, Wilmington Blue shares were owned as follows:

| | | |
|---|---|---|
| Winifred Ward | 79,142 | |
| Ellison W. Putney | 71,255 | |
| Thomas Putney | 9,950 | (rec'd from Mrs. Ward) |

There was every indication from the testimony of Thomas Putney that Mrs. Ward was going to leave the building to Tom at 843 Tatnall Street and that she was going to leave the bulk of her stocks to Thomas.[3]

<hr/>

**2.** He expected to receive 843 Tatnall Street from his grandmother.

**3.** Thomas Putney, Direct, Tr. pp. 177, 178:

If the indication that Winifred will leave her stock to Tom is correct, then Tom would have 89,092 shares, including his 9,950. Ellison's 71,255 would go to Helen.

Insofar as AVA is concerned, Ellison owned 71,644 shares and Winifred owned 70,368. Helen was given 23,565 by Ellison and Ryan, her son, was given 10,365 by Ellison. Assuming that the indication is correct, namely that the grandmother would leave her stock to Tom, then Helen would have control of 105,574 shares after Ellison's death, when she inherited the stock by will, and Tom would own 70,368 shares in AVA after his grandmother's death.

Thus, Helen would control AVA with Tom having a substantial minority interest and Tom would control Wilmington Blue with Helen having a substantial minority interest. This would only happen if Tom's indication of what his grandmother would do is correct and if Ellison is allowed to die testate with the true copy of the will having been produced.

Ellison's intent to revoke his will is not borne out by the record. If he wanted to help Hilton, a trust of income would have been logical, with remainder to Hilton's son, Ryan. Too many people had access to papers belonging to Ellison. His mother, Winifred Ward, occupied his apartment for six months prior to his death. She shared a safe deposit box at the Bank of Delaware with him—although there is no indication she entered that box in the last year. Tom visited his father's apartment almost every day while he was in the hospital. All the papers that belonged to Ellison were removed from his apartment to Tom's immediately after his death. These circumstances and others recited in the record and recited herein are enough to rebut the presumption of intestacy.

Ellison's mother was in Hilton's apartment six months every year. The winter months, she spent at her home in Arizona. She testified she was virtually unaware of Ellison's close relationship with Helen. Mrs. Ward is a bright person—everyone who has known her and testified confirmed this. It is difficult to imagine her surprise at discovery of Ellison's and Helen's close relationship after his demise. Generally, she knew what was happening in Wilmington. She'd be in touch by phone every day when she was in Arizona. Ellison called her every day. She shouldn't have been too surprised to discover that Tom and Hilton were substantially omitted from the will of Ellison. She was aware of what Ellison thought of them, their ability and their business acumen. With her stock she could rectify any omission of Ellison's. That can be done by her now, if necessary.

In Ellison's final days, when the joint account was opened by Helen so that his bills could be paid, Helen was the first to contribute to the joint account. She deposited her tax refund money of approximately $4,500 to the account. The proceeds of the Treasury Bonds, which were sold for

"Q. I am going to refer you and show you your testimony ... as to what your father stated. And I will read it. ' "Mrs. Ward is going to leave the building to you at 843 Tatnall Street. She is going to leave the bulk of her stocks to you" That kept me quiet for another year.' Do you recall testifying to that?

"A. If that is what I said, yes, sir.

* * * * * *

"Q. So, as of the time of the deposition it was your belief and your testimony that, based on what your Dad had told you, that your grandmother is going to leave you the building, which is the building on which Wilmington Blue is located?

"A. Yes, sir.

"Q. And she owned that, of course?

"A. Yes.

"Q. And your grandmother is going to leave you the bulk of her stock?

"A. At that time.

"Q. And is it accurate that—

"A. He may have said she is going to leave me the bulk of her stocks through me, which you will inherit later, or directly. I do not remember which way he would have phrased that.

"Q. But in any event, your testimony at the deposition was Dad told me she, Grandmom, is going to leave me the bulk of her stock; is that correct?

"A. That is what I said, yes sir."

$29,000, not the maturity value of $40,000, as the majority opinion recites, was deposited in the joint account. A check for $10,000 was drawn on this account by Helen in favor of Tom for the purchase of one of the Tatnall Street properties adjacent to Wilmington Blue. The other $10,000 check to Tom was signed by Ellison a few days before his death. These acts and directions by Ellison are inconsistent with any intent he had to die intestate, i.e., without a will. Helen's taking the gold coins shortly before her trip to Europe is inexplicable except for the fact that Ellison's mother shared the safe deposit box where the gold coins were kept with Ellison, her son.

The Vice-Chancellor's decision puts Helen's ex-husband in partial control of AVA—and Tom gains control. Hilton knows nothing about the AVA business; and Tom knows little. Helen, the person who has done so much for the business, would lose her ownership control and the presidency, but she would own most of the land and buildings on which the business is located.

The Vice Chanceller caused the 1978 will to be revoked and in its place he substituted his will in the interest of trying to balance the equities between the two brothers' families—but the decision has created chaos instead of an orderly and reasonable distribution of both businesses as a testacy would probably provide. This appears to be what Ellison really wanted done—especially to see AVA survive in strong hands with the entrance of Ryan into the business on the way. Tom's family, with the help of Mrs. Ward, it seems very likely would have the other thriving business.

The decision of the Vice Chancellor appears to be against the weight of the evidence. No declarations were ever made by Ellison that would indicate he wanted to revoke his will or intended to do so. See, *Matter of the Estate of Fisher*, 344 N.W.2d 579, 581 (Iowa App.,1983). There was a continuing good relationship between Ellison and Helen up to the date of his death; and further, the possibility of access existed by persons who could satisfy their personal desires and others with a monetary interest. Cf., *Jackson v. Jackson*, 132 Ill. App.2d 66, 268 N.E.2d 62, 65 (App.Ct. Ill, 2d Dist, 1971). The evidence before the Chancellor was sufficient to rebut the presumption of destruction by the testator of his will with the intent to revoke it. For the reasons herein, I would instruct the Vice Chancellor to allow the exact copy of the will that was furnished by the proponent's lawyer to be probated.