# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

TAMIKA R. MONTGOMERY-REEVES
VICE CHANCELLOR

Leonard Williams Justice Center
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

Date Submitted: May 23, 2018
Date Decided: August 20, 2018

William P. Brady, Esquire
Nichole Whetham Warner, Esquire
The Brady Law Firm
240 N. James Street, Suite 106
Wilmington, DE 19804

Ms. Robin D. Matthews-Wright
15 Ryan Ave.
New Castle, DE 19720

Charles Gruver III, P.A., Esquire
724 Yorklyn Road, Suite 315
Hockessin, DE 19707

> RE: ***In the Matter of the Estate of Georgianna Dodd***
> Civil Action No. 11931-VCMR

Dear Counsel and Parties:

This letter opinion addresses the issues raised by the parties during the April 20, 2018 trial and in the parties' post-trial filings, namely, whether the 1980 Last Will and Testament of Georgianna Dodd (the "Will") was a valid will, whether Georgianna Dodd ("Dodd") revoked the Will, and whether this Court should grant Petitioner's request for attorney's fees. The facts in this opinion reflect my findings based on admitted allegations in the pleadings, trial testimony, and twenty-two trial

exhibits.[1]  For the reasons set forth below, I conclude that Dodd's Will was valid,

but that she revoked the Will prior to her death, and I deny Petitioner's request for

attorney's fees.

## I.   BACKGROUND

In 1980, shortly after her husband passed away, Georgianna Dodd met with

an attorney to make her Will.[2]  On August 6, 1980, she executed the Will.[3]  Three

witnesses also signed the Will, and a notarized affidavit is attached to the Will.[4]

At the time she signed the Will, Dodd had two children, Olivia Matthews and

Respondent Albert Matthews.[5]  Under the terms of the Will, Dodd's estate would

pass to Olivia, and if Olivia predeceased Dodd, then the estate would pass to Olivia's

children,    Petitioner    Cheryl    Matthews-Johnson    and    Respondent    Robin

---

[1]    Citations to the trial transcript are in the form "Tr. # (X)" with "X" representing the surname of the speaker.  Joint trial exhibits are cited as "JX #."  Citations to the parties' briefs are to their post-trial briefs.

[2]    Tr. 33:23-34:19 (Matthews-Johnson).

[3]    JX 1.

[4]    *Id.*

[5]    Tr. 25:19-26:12 (Matthews-Johnson).  To avoid confusion, I refer to the family members of Georgianna Dodd by their first names.  No disrespect is intended.

Matthews-Wright.[6] Dodd explicitly excluded her son Albert and her stepdaughter Mary Ann Griffin from receiving any portion of her estate.[7]

Dodd's primary asset was her home at 15 Ryan Avenue, New Castle, Delaware (the "Property").[8] She had lived there for decades,[9] and her adult children and grandchildren resided there with her, off and on, through the years.[10]

By 2005, twenty-five years after Dodd executed the Will, her health had declined and she resided at Parkview, a nursing home.[11] She suffered from dementia, hypertension, and osteoarthritis.[12] Dodd's son Albert filed a petition for guardianship of Dodd,[13] and Dodd's granddaughters Cheryl and Robin filed a cross-

---

[6] JX 1, at 1. Olivia predeceased Dodd in July 2005. Pet'r's Mem. 2 n.3.

[7] *Id.* at 2.

[8] *See* JX 3 (Inventory of Dodd estate); JX 8 (Amended Inventory of Dodd estate).

[9] *See* Tr. 64:8-10 (Matthews-Johnson).

[10] *See* Tr. 24:21-25:11, 64:8-12, 64:16-18 (Matthews-Johnson); Tr. 126:16-128:8 (Matthews-Wright); Tr. 163:10-24 (Matthews).

[11] Tr. 31:16-21 (Matthews-Johnson).

[12] JX 11 (Affidavit of Dr. Aurigemma).

[13] *Id.*

petition for guardianship.[14]  Robin and Cheryl included a copy of the Will as an exhibit to their cross-petition.[15]  Cheryl later withdrew from the cross-petition,[16] and Robin was appointed guardian.[17]  Cheryl and Robin continued to live at the Property while Dodd resided at Parkview.[18]

In September 2013, Dodd passed away.[19]  No action was taken with regard to Dodd's estate until June 24, 2014, when Robin filed the Petition for Authority to Act as Personal Representative for the Dodd estate.[20]  In this petition, Robin stated that Dodd had no will,[21] listed Albert and herself as the only surviving relatives of Dodd, and omitted Cheryl from the list of surviving relatives.[22]  Robin also filed an

---

[14]    JX 12.  Olivia was not able to seek guardianship of her mother due to her own health issues at the time.  Pet'r's Mem. 2 n.3.

[15]    *Id.* at Ex. B.

[16]    JX 16, at 1.

[17]    JX 18, at 1.

[18]    *See supra* note 10.

[19]    JX 2, at 1.

[20]    JX 2.

[21]    *Id.* at 1.

[22]    *Id.* at 2.

Inventory of the Dodd estate that same day.[23]  In that Inventory, Robin stated that the Property "[p]asses to Robin" only.[24]

Cheryl was unaware that Robin had opened the Dodd estate.[25]  Cheryl discovered in June 2015 that the estate had been opened, and closed, in 2014.[26]  On June 20, 2015, Cheryl sent a letter to the Register of Wills explaining that the estate had been improperly distributed to Robin alone and that Dodd had a will at the time of her death.[27]  In response, the Register of Wills sent a letter to Robin instructing her to amend the inventory of the Dodd estate by including Albert and "all lineal descendants of [Dodd's] other children."[28]

On August 11, 2015, Robin filed an Amended Inventory stating that the Property "[p]asses to Albert" alone.[29]  Robin omitted both herself and Cheryl from

---

[23]    JX 3.

[24]    *Id.* at 2.

[25]    Tr. 47:9-10 (Matthews-Johnson).

[26]    *See* Tr. 47:11-13 (Matthews-Johnson); JX 6.

[27]    JX 6.

[28]    JX 7.

[29]    JX 8, at 2.

the Amended Inventory.[30]  On January 21, 2016, Albert sent a letter to Cheryl demanding that she vacate the Property.[31]  The Property currently is deeded to Albert,[32] but Robin and Cheryl reside at the Property.[33]

Cheryl, represented by counsel, filed her Verified Petition for an Order to Show Cause Regarding the Administration of the Estate of Georgianna Dodd, Decedent, and Petition to Remove Administratrix on January 26, 2016, naming Albert and Robin as Respondents.  In her Petition, Cheryl requests that this Court reopen the Dodd estate, remove Robin as the administratrix of the Dodd estate, admit into probate a copy of the Will, and appoint Cheryl as the personal representative of the Dodd estate.  Albert, represented by counsel, filed his Answer to the Petition on March 24, 2016.  Robin, representing herself, filed her Answer on July 14, 2016.  Although this matter involves issues beyond the validity and status of the Will, the parties first seek to resolve whether the Will was validly executed and whether Dodd

---

[30]     *See id.*

[31]     JX 10.

[32]     JX 9.

[33]     Pet. ¶¶ 2-3.

subsequently revoked the Will. This Court held a one-day trial regarding the validity and status of the Will on April 20, 2018.

## II. ANALYSIS

Petitioner requests that I admit into probate a copy of the Will. In order to address that request, I perform a two-step analysis. The first step in the analysis determines whether the Will meets the statutory requirements of 12 *Del. C.* § 202. The second step in the analysis then determines whether Dodd revoked the Will. Petitioner also requests attorney's fees, which I address below.

### A. The Will Was Validly Executed

For a will to be valid, (1) the testator must have testamentary capacity, (2) the will must be in writing and signed by the testator or another person acting under the testator's express direction and in the testator's presence, and (3) the will must be signed by two credible witnesses.[34] "Delaware law disfavors invalidating a testamentary plan and this Court therefore presumes that a will is valid[ and] that a testator possessed testamentary capacity at the time she executed a will . . . ."[35] For that reason, the challenger of a will generally bears the burden of proof by a

---

[34]    12 *Del. C.* §§ 201-203. These sections of the current Delaware Code are substantively identical to the operative sections in 1980.

[35]    *In re Kittila*, 2015 WL 688868, at *11 (Del. Ch. Feb. 18, 2015).

preponderance of the evidence.[36] To meet this burden, the challenger's evidence, "when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[37]

The parties do not dispute Dodd's testamentary capacity at the time of execution or the authenticity of Dodd's signature on the Will. This Court therefore addresses only Albert's argument that the Will was not properly signed by at least two witnesses.[38]

To be valid, a will must be "attested and subscribed in [the] testator's presence by 2 or more credible witnesses."[39] "Any person generally competent to be a witness may act as a witness to a will."[40] A will "need not be signed in the presence of the witnesses, but must be acknowledged by the testator to [the witnesses]."[41] There is

---

[36]     *Id.*

[37]     *Id.* (quoting *Mitchell Lane Publ'rs, Inc. v. Rasemas*, 2014 WL 4925150, at *3 (Del. Ch. Sept. 30, 2014)).

[38]     *See* Resp. Matthews' Mem. 2-6.

[39]     12 *Del. C.* § 202(a)(2).

[40]     12 *Del. C.* § 203(a).

[41]     *Sutton v. Sutton*, 5 Del. (5 Harr.) 459, 460 (Super. 1854); *accord In re Hallett's Estate*, 295 A.2d 755, 756 (Del. Ch. 1972).

also no requirement that the witnesses attest and subscribe the will in the presence of each other.[42]

The second page of the Will (the "Signature Page") and the attached affidavit (the "Affidavit") both contain the signatures of Dodd and three witnesses: Bettina G. Heiman, Theresa K. Di Carolis, and Mary Ann Griffin.[43] All three witnesses gave testimony, either at trial or in deposition, regarding circumstances surrounding the execution and witnessing of the Will.

### 1. Witness 1: Bettina G. Heiman

Heiman testified during trial that she is the wife of a Delaware attorney and that she sometimes helped him in his practice, including acting as a witness for the execution of wills.[44] In her testimony, Heiman verified her signatures on the

---

[42]   *See* 12 *Del. C.* § 202(a)(1); *In re Purported Will of Young*, 1998 WL 409168, at *6 (Del. Ch. June 24, 1998); *Hallett's Estate*, 295 A.2d at 756.

[43]   The Signature Page, below Dodd's signature and above the witnesses' signatures, contains text pertaining to the witnesses' signatures: "SIGNED, SEALED, PUBLISHED, AND DECLARED, by the above, GEORGIANNA DODD as and for her LAST WILL AND TESTAMENT, in the presence of us who at her request in her presence and in the presence of each other have hereinto [sic] subscribed our names as witnesses." JX 1, at 2. This text stating that the witnesses signed in each other's presence is superfluous to the requirements of a valid will under the Delaware Code.

[44]   Tr. 137:10-24, 138:18-20 (Heiman).

Signature Page and the Affidavit.[45] She did not recall meeting Georgianna Dodd thirty-eight years ago or witnessing this Will specifically,[46] but she testified credibly that she would not have signed the Will without Dodd being present in the room at the time.[47]

### 2. Witness 2: Theresa K. Di Carolis

Di Carolis testified during trial that she worked as a secretary for attorneys Henry Heiman and Hank Bernstein[48] in 1980.[49] As part of her employment, she acted as a witness during clients' will signings.[50] She credibly verified her signatures on the Signature Page and the Affidavit.[51] She also recalled that Bettina Heiman was the wife of attorney Henry Heiman.[52] Di Carolis explained in her testimony that

---

[45] Tr. 139:19-140:1 (Heiman).

[46] Tr. 140:2-7 (Heiman).

[47] Tr. 140:21-141:11 (Heiman).

[48] Attorneys Heiman and Bernstein were the two sole partners in their law firm in 1980. Tr. 138:1-17 (Heiman). There is conflicting testimony as to which attorney assisted Dodd with the Will. *Compare* Tr. 16:12-14 (Di Carolis) *with* JX 22, at 20. This conflicting testimony is collateral to the issue of the validity of the Will.

[49] Tr. 12:9-14 (Di Carolis).

[50] Tr. 12:18-21 (Di Carolis).

[51] Tr. 15:5-10 (Di Carolis).

[52] Tr. 15:11-14 (Di Carolis).

it was the law firm's procedure during will signings that the client sign his or her will in front of the witnesses[53] and this procedure was followed during Dodd's will signing.[54] Di Carolis was not asked, nor did she testify, whether she subscribed and attested the Will in Dodd's presence or whether it was the law firm's procedure for the witness to subscribe and attest a will in front of the testator.

### 3. Witness 3: Mary Ann Griffin

Griffin is the stepdaughter of Dodd.[55] She testified in her deposition that she worked as a secretary for attorneys Bernstein and Heiman in the 1980s.[56] Griffin recalled several details about the Dodd will signing. She recalled signing the Signature Page as a witness and that Bernstein and Dodd were in the room when she witnessed the Will.[57] She also specifically recalled that Bettina Heiman and Di Carolis were not present when she witnessed the Will.[58]

---

[53]      Tr. 17:8-14 (Di Carolis).

[54]      *See* Tr. 17:15-18 (Di Carolis).

[55]      JX 22, at 14.

[56]      *Id.* at 11-12.

[57]      *Id.* at 39-40.

[58]      *Id.* at 40-43.

### 4. Section 202 is satisfied

Albert argues that Griffin's recollection of the will signing is the most reliable of the three witnesses because Dodd was her stepmother, Griffin has a personal connection to the events that occurred in 1980, and Griffin remembers more specific details about the Will signing.[59] I agree with him on this point. Albert then attacks the credibility of Heiman and Di Carolis because there are discrepancies in the three witnesses' descriptions of events that happened decades ago, such as which attorney assisted Dodd with the Will.[60] These discrepancies, however, do not go to the crux of the issue—whether the witnesses signed the Will in the presence of Dodd.

Each witness credibly verified her signature. Heiman and Griffin also credibly testified that Dodd was present when they attested and subscribed the Will.[61] No one asked Di Carolis whether Dodd was present when she attested and subscribed the Will or whether the law firm's policy required the testator's presence.[62] It is immaterial that the three witnesses did not subscribe and attest the Will in each other's presence, and Delaware requires only two witnesses for a valid

---

[59]    Resp. Matthews' Mem. 2-4.

[60]    *Id.* at 4-6. *E.g.*, *compare* Tr. 16:12-14 (Di Carolis) *with* JX 22, at 20.

[61]    Tr. 140:21-141:11 (Heiman); JX 22, at 39-40.

[62]    *See* Tr. 12:3-23:16 (Di Carolis).

will.  Thus, the requirement of 12 *Del. C.* § 202 that a will be attested and subscribed in the testator's presence by two or more credible witnesses is satisfied.  Albert asserts no other challenges to the validity of the Will.  Therefore, I find that the Will has met all execution formalities and is a valid will.

## B.  Dodd Revoked Her Will

"It is presumed that someone who had a will intended to die testate."[63]  But "[w]hen a will that was last in the testator's possession is missing at the time of probate, it is presumed that the testator discarded or intentionally destroyed it with the intent that it be revoked."[64]  These two legal presumptions conflict with each other, and I must therefore weigh the evidence in this case carefully.[65]

To overcome the presumption of revocation, the proponent of the missing will must show by a preponderance of the evidence "(i) that a valid will was executed by the decedent, (ii) the terms of that will, (iii) that the will was lost or unintentionally

---

[63]  *In re Purported Will of Kuklinski*, 1995 WL 106504, at *7 (Del. Ch. Feb. 7, 1995).

[64]  *In re Boyd*, 2003 WL 21003272, at *8 (Del. Ch. Apr. 24, 2003); *see Putney v. Putney*, 487 A.2d 1125, 1127 (Del. 1984).

[65]  *Kuklinski*, 1995 WL 106504, at *7.

destroyed, and (iv) that the decedent's testamentary intent was not altered before [her] death."[66]

I have already addressed the validity of the Will above. A copy of the executed Will establishes the terms of the Will.[67] Thus, I need address only (1) whether the Will was lost or unintentionally destroyed and (2) Dodd's testamentary intent.

### 1. There is insufficient evidence to show the Will was lost or unintentionally destroyed

Dodd executed the Will at her attorney's office.[68] After the Will signing, Dodd left the attorney's office and was not accompanied by anyone else.[69] Cheryl and Robin both were aware that Dodd had made the Will, and they had general knowledge of the terms of the Will.[70] Neither of them, however, testified that she ever saw the original Will.[71] Nor did they testify that Dodd discussed the Will with

---

[66]    D.R.E. 301(a); *Boyd*, 2003 WL 21003272, at *8.

[67]    *See* JX 1.

[68]    JX 22, at 39-40.

[69]    *Id.* at 47.

[70]    Tr. 33:10-34:12 (Matthews-Johnson); Tr. 101:21-102:10 (Matthews-Wright).

[71]    *See* Tr. 32:22-23 (Matthews-Johnson); Tr. 116:17-117:12 (Matthews-Wright).

either of them.[72]  Similarly, Dodd never talked to Albert about her Will; Albert was unaware that Dodd had made a will until 2005 and never saw the original copy of the Will.[73]

After Dodd moved to Parkview in 2004 or 2005, Cheryl cleaned Dodd's room and did not discover the original Will.[74]  In 2005 when Robin and Cheryl filed their cross-petition in the guardianship action, Robin obtained a copy of the Will from Mr. Heiman's office.[75]  After Dodd's death, Cheryl and Robin searched for the original copy of the Will, but neither of them found it.[76]

This Court has noted that a testator's habits and living conditions may influence the analysis of whether a will was lost or unintentionally destroyed.  In *In re Purported Will of Kuklinski*, the Court specifically focused on Kuklinski's living conditions.[77]  Kuklinski left food out in the open, and one bedroom in his home was

---

[72]     *See* Tr. 34:20-36:7 (Matthews-Johnson); Tr. 100:15-129:11 (Matthews-Wright).

[73]     Tr. 156:18-23, 164:24-165:2 (Matthews).

[74]     Tr. 41:22-42:18 (Matthews-Johnson).

[75]     Tr. 116:17-117:12 (Matthews-Wright).

[76]     Tr. 41:8-42:22 (Matthews-Johnson).

[77]     *See* 1995 WL 106504, at *2 (Del. Ch. Feb. 7, 1995).

filled with boxes at least twenty-five years old.[78] In searching for the will, Kuklinski's niece went so far as to look in the dishwasher.[79] In short, the home was filled with "the debris of a long life."[80] Kuklinski's "habit of keeping all sorts of papers at his home could easily have led to the loss or misplacement of the will with no intent on his part to revoke it."[81] This Court therefore held that Kuklinski's will had been lost or misplaced and admitted a copy of the will to probate.[82]

In *In re Wilson Estate*, the testator executed a will three years before her death.[83] She also executed a codicil to the will.[84] During her final illness, the testator discussed her will with her husband.[85] She kept both the will and the codicil in her desk drawer, but after her death, her family found only the original codicil; they

---

[78]     *Id.*

[79]     *Id.* at *1.

[80]     *Id.* at *2.

[81]     *Id.* at *7.

[82]     *Id.* at *8.

[83]     1999 WL 504783, at *1 (Del. Ch. July 13, 1999).

[84]     *Id.*

[85]     *Id.* at *2.

could not find the original will.[86] Each beneficiary of the will and each intestate heir

supported the petition to admit a copy of the will to probate; no party opposed the

petition.[87] The will named the same beneficiaries as those who would be intestate

heirs, and the only difference between the will's terms and the statutes of intestacy

was that the will lessened the tax liability associated with the estate.[88] This Court

held that the evidence rebutted the presumption that the missing will was destroyed

by the testator, and the Court admitted an unsigned copy of the will to probate.[89]

Here, the record does not indicate that Dodd's living conditions had become

disorganized or that she hoarded an insurmountable amount of papers. The record

indicates quite the opposite, that Dodd kept her important papers together in one

place, a brown briefcase.[90] Both Cheryl and Robin searched for the Will but did not

find it.[91] They never saw the original copy of the Will, and Dodd did not discuss the

---

[86]     *Id.* at *1.

[87]     *Id.*

[88]     *Id.* at *2.

[89]     *Id.*

[90]     Tr. 32:6-15 (Matthews-Johnson).

[91]     Tr. 41:8-42:22 (Matthews-Johnson).

Will with them or any of the other trial witnesses.[92]  I therefore find that Cheryl has not met her burden to show by a preponderance of the evidence that the Will was lost or unintentionally destroyed.

### 2. Cheryl has not shown that Dodd's testamentary intent was not altered before her death

The evidence regarding Dodd's testamentary intent after 1980 is scant.  Dodd did not discuss the Will with her son or granddaughters.  Cheryl testified that she had a close relationship with Dodd[93] and that Dodd did not change or revoke the Will.[94]  As evidence that Dodd's testamentary intent was not altered, Cheryl points to documents filed in the 2005 guardianship action.

During the guardianship action, the Court appointed an Interim Guardian.[95] As part of that process, a nurse interviewed Dodd.[96]  During the interview, the nurse asked Dodd about the Property and whether she wanted to sell the Property.[97]  As

---

[92]     *See* Tr. 32:22-23, 34:20-36:7 (Matthews-Johnson); Tr. 100:15-129:11 (Matthews-Wright); Tr. 151:9-10 (Matthews); JX 22, at 32-33.

[93]     *See* Tr. 35:10-36:6, 67:9-20 (Matthews-Johnson).

[94]     Tr. 40:17-41:2 (Matthews-Johnson).

[95]     JX 15, at 1.

[96]     *See id.* at 4.

[97]     *Id.* at 5.

part of the guardianship proceeding, both the Interim Guardian and the nurse submitted reports to the Court.[98]

The nurse's report states that Dodd liked her "family" living at the Property and that she did not want to sell the Property because she preferred her "family" living there over having money from the sale of the Property.[99] In his report, the Interim Guardian interprets "family" to mean Dodd's grandchildren.[100] Cheryl testified that "family" and "grandchildren," as used in the context of Dodd's wishes for the use of the Property, mean Cheryl and Robin because although they are not Dodd's only grandchildren, they are the two grandchildren who were born and raised at the Property and who resided there in 2005.[101] Cheryl's interpretation supports the terms of the Will. But these reports do not directly address Dodd's testamentary intent.[102] Further, in 2005, Dodd's dementia was apparent; it is questionable whether

---

[98]     *Id.* at 1, 4.

[99]     *Id.* at 5.

[100]    *Id.* at 2.

[101]    Tr. 66:13-67:15 (Matthews-Johnson).

[102]    *See* JX 15.

she would have had the requisite testamentary capacity at that time to declare her testamentary intent.[103]

Albert offers a different perspective. Albert testified regarding the evolution of his relationship with Dodd. When Dodd executed the Will in 1980, Albert was incarcerated.[104] Cheryl testified that Dodd disinherited Albert because Dodd disapproved of his substance abuse and related conduct.[105] But after Albert was released from prison, he reformed his life.[106] He subsequently lived with Dodd for several years,[107] and they had a good relationship.[108] Dodd welcomed him home when he needed a place to stay.[109] The Property was the family home, and if a member of the family needed a place to stay, he or she was welcome.[110] Thus, Albert

---

[103]  *See* Tr. 112:11-22 (Matthews-Wright) (testifying that Dodd would not have been able to execute a will in 2005).

[104]  Tr. 161:17-23 (Matthews).

[105]  Tr. 36:18-37:14 (Matthews-Johnson).

[106]  Tr. 37:5-7 (Matthews-Johnson).

[107]  Tr. 162:19-20, 163:10-24 (Matthews).

[108]  Tr. 124:24-125:1 (Matthews-Wright); Tr. 163:1-4 (Matthews).

[109]  Tr. 164:1-6 (Matthews).

[110]  *See, e.g.*, Tr. 92:4-15 (Matthews-Johnson) (describing the Property as the family home and stating that one of Albert's children had also lived at the Property).

believes that Dodd intentionally destroyed the Will and that, after their relationship improved, Dodd had no intent to disinherit him.

Cheryl and Albert both present evidence regarding Dodd's testamentary intent. Both sets of evidence are equally convincing. I therefore find that Petitioner has not shown by a preponderance of the evidence that Dodd's testamentary intent was not altered before her death.

Because Petitioner has not sufficiently shown that the Will was lost or unintentionally destroyed and that Dodd's testamentary intent was not altered before her death, this Court must presume that Dodd discarded or intentionally destroyed the Will with the intent that it be revoked. Therefore, Dodd's estate will pass according to the statutes of intestacy to Cheryl, Robin, and Albert.[111]

### C.    Petitioner's Request for Attorney's Fees

Petitioner requests that this Court award her attorney's fees because (1) had Robin not omitted Cheryl from the Inventory filed with the Register of Wills, this litigation would have been unnecessary and (2) Albert's January 2016 demand that Cheryl vacate the Property was made in bad faith.[112]

---

[111]    *See* 12 *Del. C.* § 503.

[112]    Pet'r's Mem. 10-12.

Under the "American Rule," "each party is normally obliged to pay only his or her own attorneys' fees, whatever the outcome of the litigation."[113] Under my equitable powers, I may shift attorney's fees and costs in certain limited circumstances, including (1) if there is express statutory authority; (2) "where the judge concludes a litigant brought a case in bad faith or through his bad faith conduct increased the litigation's cost; and (3) cases in which, although a [respondent] did not misuse the 'litigation process in any way, . . . the action giving rise to the suit involved bad faith, fraud, "conduct that was totally unjustified, or the like" and attorney's fees are considered an appropriate part of damages.'"[114]

Petitioner's argument that litigation would have been unnecessary had Robin included Cheryl's name on the Inventory or Amended Inventory fails. At the heart of this trial, Petitioner requests that this Court admit a copy of the Will to probate.[115] Petitioner does not have the executed original copy of the Will. Thus, this action was always necessary to admit a copy of the Will to probate. Robin's representation

---

[113] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998) (omission in original) (quoting *Barrows v. Bowen*, 1994 WL 514868, at *1 (Del. Ch. Sept. 7, 1994)).

[114] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686-87 (Del. 2013).

[115] Pet. ¶¶ 31-33.

that Dodd died without a will[116] is consistent with the fact that neither Robin nor Cheryl found Dodd's Will. Robin, therefore, did not make this representation in bad faith.[117]

At the time that Albert demanded Cheryl vacate the Property, he was the sole legal owner of the Property.[118] He became the owner after Robin filed the Amended Inventory stating the Property passes to Albert alone.[119] He took no action in bad faith related to Property.

Therefore, Petitioner's request for attorney's fees is denied.

## III. CONCLUSION

For the foregoing reasons, I conclude that the Will was validly executed but that Dodd revoked the Will before her death. I deny Petitioner's request for attorney's fees.

---

[116]     JX 2, at 1; *see* JX 8.

[117]     This finding relates only to the testacy or intestacy of the Dodd estate. Petitioner's argument that Robin made false statements on the Inventory is relevant to the administration of the Dodd estate and will be addressed in the context of resolving whether this Court should remove Robin as the administratrix of the Dodd estate.

[118]     JX 9, at 1; JX 10.

[119]     *See* JX 8, at 2.

The parties and counsel shall confer and advise the Court within twenty days of this letter opinion as to any outstanding matters that require the Court's attention.

**IT IS SO ORDERED**.

Sincerely,

*/s/ Tamika Montgomery-Reeves*

Vice Chancellor

TMR/jp